# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUDITH GOVATOS, ANDREA SEALY, DR. PAUL BRYMAN, DO, FACOI, AGSF, CMD, and DR. DEBORAH PASIK, MD, FACR,<br><br>    Plaintiffs,<br>  v.<br><br>PHILIP MURPHY, Governor of New Jersey, MATTHEW J. PLATKIN, in his official as Attorney General of New Jersey, KAITLAN BASTON, in her official capacity as New Jersey Acting Health Commissioner, ANTONIA WINSTEAD, in her official capacity as Executive Director of New Jersey Board of Medical Examiners; GRACE C. MACAULAY, in her official capacity as the Prosecutor of Camden County, New Jersey.<br><br>    Defendants. | Hon. Renée Marie Bumb, U.S.D.J.<br>Hon. Elizabeth A. Pascal, U.S.M.J.<br><br>CIVIL ACTION NO.<br>1:23-CV-12601-RMB-EAP<br><br><br>**<u>CIVIL ACTION</u>**<br>**(ELECTRONICALLY FILED)** |

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

---

Melissa Schaffer
*Assistant Attorney General*

Francis X. Baker
Christopher Ioannou
*Deputy Attorneys General*

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
*Attorney for Defendants*

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...............................................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............................3

   A. The Medical Aid in Dying for the Terminally Ill Act................................3

   B. Requirements and Safeguards Imposed Under the Act.............................5

   C. The Parties and Complaint .......................................................................7

STANDARD OF REVIEW ...............................................................................8

ARGUMENT ....................................................................................................9

   I.     THE ACT DOES NOT VIOLATE THE PRIVILEGES AND
         IMMUNITIES CLAUSE ....................................................................9

         A.    The Residency Requirement Does Not Burden A
             Fundamental Privilege ..............................................................11

         B.    The Residency Requirement Serves, and Is
             Substantially Related to, Substantial Government
             Interests ..................................................................................17

             1. Substantial Interests Support The Residency
                Requirement ......................................................................18

             2. The Residency Requirement Is Substantially
                Related to the State's Interest in Protecting
                Those Who Provide MAID................................................23

   II.    THE ACT DOES NOT VIOLATE THE DORMANT
         COMMERCE CLAUSE ....................................................................25

         A.    The Act Does Not Implicate the Dormant
             Commerce Clause .....................................................................26

       B.    The Act Satisfies the *Pike* Balancing Test................................28

          1.  The Act Regulates Evenhandedly to Effectuate a Legitimate Public Purpose.....................................................30

          2.  The Act's Effects on Interstate Commerce, If Any, are Incidental..............................................................30

          3.  Any Incidental Burden Imposed on Commerce By the Act Is Not Excessive In Relation to Its Benefits ...............................................................................35

III.    THE ACT DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE ..................................................36

CONCLUSION ........................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**U.S. Constitution**

U.S. Const. art. I, § 8, cl. 3.................................................................*passim*

U.S. Const. art. IV, § 2........................................................................*passim*

U.S. Const. amend. XIV, § 8 .................................................... 2, 8, 36-37

**Cases**

*A.L. Blades & Sons, Inc. v. Yerusalim,*
121 F.3d 865 (3d Cir. 1997) .........................................................10, 23

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff,*
669 F.3d 359 (3d Cir. 2012) .................................................................28

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..........................................................................8, 9

*Baldwin v. Fish & Game Comm'n of Mont.,*
436 U.S. 371 (1978)...................................................................*passim*

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)...............................................................................8

*Bronson v. Swensen,*
500 F.3d 1099 (10th Cir. 2007) .............................................................9

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
476 U.S. 573 (1986)..............................................................................28

*City of Philadelphia v. New Jersey,*
437 U.S. 617 (1978)....................................................................... 29-31

*City of Pittsburgh v. W. Penn Power Co.,*
147 F.3d 256 (3d Cir. 1998) ..................................................................9

*Cloverland–Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.,*
462 F.3d 249 (3d Cir. 2006) ................................................................26

*Connelly v. Steel Valley Sch. Dist.*,
  706 F.3d 209 (3d Cir. 2013) .............................................................36

*Corfield v. Coryell*,
  6 F.Cas. 546 (CCED Pa. 1825) ...................................................12, 16

*Cruzan v. Director, Mo. Dep't of Health*,
  497 U.S. 261 (1990)......................................................................18, 27

*Doe v. Bolton*,
  410 U.S. 179 (1973).............................................................................14

*Drake v. Gordon*,
  848 F.2d 701 (6th Cir. 1988) .............................................................37

*F.C.C. v. Beach Comm'cns, Inc.*,
  508 U.S. 307 (1993).............................................................................38

*Friedman v. Supreme Court of Va.*,
  822 F.2d 423 (1987) (4th Cir. 1987)..................................................37

*Hawaii Boating Ass'n v. Water Transp. Facilities Div., Dep't of Transp., State of Hawaii*,
  651 F.2d 661 (9th Cir. 1981) .............................................................37

*Heffner v. Murphy*,
  745 F.3d 56 (3d Cir. 2014) .................................................................30

*Hughes v. Alexandria Scrap Corp.*,
  426 U.S. 794 (1976).............................................................................27

*Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*,
  48 F.3d 391 (9th Cir. 1995) .............................................................32

*Kligler v. Att'y Gen.*,
  198 N.E.3d 1229 (Mass. 2022).........................................4, 13, 15, 19

*Lewis v. Alexander*,
  685 F.3d 325 (3d Cir. 2012) .................................................................9

*Lunding v. N.Y. Tax Appeals Trib.*,
  522 U.S. 287 (1998)......................................................................10, 18

v

*McBurney v. Young*,
    569 U.S. 221 (2013)................................................................................*passim*

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 ..........................................................................................24

*Memorial Hosp. v. Maricopa County*,
    415 U.S. 250 (1974).......................................................................... 14-15

*Mills v. Ethicon, Inc.*,
    406 F. Supp. 3d 363 (D.N.J. 2019) .....................................................34

*Myers v. Schneiderman*,
    85 N.E.3d 57 (N.Y. 2017) (per curiam).........................................13, 15

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)...............................................................................26

*Norfolk S. Corp. v. Oberly*,
    822 F.2d 388 (3d Cir. 1987) .................................................................30

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) .................................................................9

*Paul v. Virginia*,
    8 Wall. 168 (1868) ................................................................................10

*Peterson v. Martinez*,
    707 F.3d 1197 (10th Cir. 2013) ...........................................................16

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)...................................................................28-30, 36

*Raymond Motor Transp., Inc. v. Rice*,
    434 U.S. 429 (1978)...............................................................................32

*Saenz v. Roe*,
    526 U.S. 489 (1999)........................................................................15, 16

*Schumacher v. Nix*,
    965 F.2d 1262 (3d Cir.1992) ...............................................................36

*Supreme Court of N.H. v. Piper,*
    470 U.S. 274 (1985)................................................................10, 17, 23

*Tolchin v. Supreme Court of N.J.,*
    111 F.3d 1099 (3d Cir. 1997) ...............................................................35

*Toomer v. Witsell,*
    334 U.S. 385 (1948)...................................................................*passim*

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018).........................................................................38

*United Bldg. & Constr. Trades Council of Camden County and
    Vicinity v. Mayor and Council of the City of Camden,*
    465 U.S. 208 (1984).............................................................................11

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt.
    Auth.,*
    550 U.S. 330 (2007)......................................................................28, 30

*Vacco v. Quill,*
    521 U.S. 793 (1997)......................................................................15, 36

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)................................................................... 13-15

*Whiting v. Town of Westerly,*
    942 F.2d 18 (1st Cir. 1991).................................................................37

*Zahl v. Harper,*
    282 F.3d 204 (3d Cir. 2011) ........................................................25, 38

*Zobel v. Williams,*
    457 U.S. 55 (1982)...............................................................................15

**Statutes**

11 Del.C. § 204 ....................................................................... 19-21

11 Del.C. § 632 ...........................................................................4, 20

11 Del.C. § 645 ...........................................................................4, 20

11 Del.C. § 4205 ............................................................................4

18 Pa.C.S.A. § 102 ......................................................................... 20-21

18 Pa.C.S.A. § 106 ................................................................................5

18 Pa.C.S.A. § 2505 ..................................................................... 4-5, 20

18 Pa.C.S.A. § 1103 ..............................................................................4

N.J. Stat. Ann. § 26:16-2 ...............................................................*passim*

N.J. Stat. Ann. § 26:16-3 .................................................................7, 19

N.J. Stat. Ann. § 26:16-4 .................................................................5, 7

N.J. Stat. Ann. § 26:16-5 ...............................................................5, 19

N.J. Stat. Ann. § 26:16-6 ...............................................................5, 19

N.J. Stat. Ann. § 26:16-7 .....................................................................5

N.J. Stat. Ann. § 26:16-8 .....................................................................5

N.J. Stat. Ann. § 26:16-10 ...................................................................5

N.J. Stat. Ann. § 26:16-11 ...........................................................7, 8, 24

N.J. Stat. Ann. § 26:16-14 ..............................................................6, 22

N.J. Stat. Ann. § 26:16-17 ................................................ 6, 19-22, 24

N.J. Stat. Ann. § 26:16-18 ...................................................................9

N.J. Stat. Ann. § 26:16-20 ...................................................................7

N.J. Stat. Ann. § 45:1-62 ...................................................................21

**Rules**

N.J.A.C. 13:35–6B.5 ...........................................................................21

**Other Authorities**

Am. Med. Assoc., Licensure and Telehealth (2022),
    *available at* https://www.ama-assn.org/system/files/issue-brief-
    licensure-telehealth.pdf (last visited January 31, 2024) ......................21

N.J. Dept. of Health, N.J. Medical Aid in Dying for the Terminally Ill
    Act 2022 Data Summary, *available at*
    https://www.nj.gov/health/advancedirective/documents/maid/MAi
    dAnnualReport2022.pdf (last accessed January 31, 2024) ...............................34

# **INTRODUCTION**

The right to choose the terms of one's own death is a particularly weighty legal question. In 2019, New Jersey staked a position on that important issue by enacting the New Jersey Medical Aid in Dying for the Terminally Ill Act, L. 2019, c. 59 ("the Act"). The product of months of careful deliberation and input from stakeholders, the Act created the right of a qualified terminally ill patient to obtain medication that the patient can choose to self-administer in order to bring about the patient's humane and dignified death. Because of the extraordinarily high stakes associated with medical aid in dying ("MAID"), the Legislature built in certain safeguards designed to ensure that only qualified individuals are able to access MAID services and that patients, providers, and anyone voluntarily assisting a patient's request for medication under the Act do not suffer reprisals or other adverse effects by virtue of their participation. One of those safeguards is a requirement that only individuals able to demonstrate proof of New Jersey residency may access MAID. This requirement serves to protect New Jersey providers, as well as those assisting recipients of MAID, from civil and criminal liability and exposure to litigation, given the many states that do not permit such aid.

Plaintiffs, who include patients from two such neighboring states (Pennsylvania and Delaware) and two New Jersey providers wishing to provide MAID to non-residents, seek to permanently enjoin and invalidate the Act's

1

residency requirement on the basis that it violates the United States Constitution's Privileges and Immunities Clause, dormant Commerce Clause, and Equal Protection Clause. All of their claims fail as a matter of law.

First, the Act does not burden any privilege traditionally protected under the Privileges and Immunities Clause. No court has ever recognized a federal or state constitutional right to MAID, and it is not a right fundamental to the promotion of interstate harmony. Even if the residency restriction did burden any such protected right, the classification is more than justified by the State's substantial, overriding interest in protecting the liberty and livelihood of New Jersey providers and residents assisting in requests for MAID.

Plaintiffs' dormant Commerce Clause claim also fails. Indeed, because the Act is utterly unconcerned with promoting New Jersey's economic self-interest at the expense of other states, this case is not governed by the dormant Commerce Clause at all. And even were the Act to implicate the dormant Commerce Clause, it does not directly regulate or discriminate against interstate commerce and thus would not be subject to heightened scrutiny. It would easily meet the relevant balancing test because it effectuates a legitimate local public interest, its effects on interstate commerce are only incidental, and any putative burden imposed on interstate commerce is marginal in relation to the significant local benefits.

Finally, the Act does not violate Plaintiffs' Equal Protection rights. The Act does not implicate, much less unconstitutionally burden, any fundamental right. And because the Act does not discriminate against any suspect or protected class, it need only satisfy rational basis review, which it categorically does.

The State's Legislature carefully constructed the Act's terms with due regard both for the rights of terminally ill individuals and the protection of New Jersey residents responsible for aiding those individuals. In fact, the safeguards embedded within the Act played a significant role in earning the confidence and support necessary to secure its passage. Without demonstrating any constitutional infirmity, Plaintiffs' lawsuit invites the federal judiciary down a precarious path, inducing it to slowly erode the lines meticulously drawn by the Legislature at great and unnecessary risk to New Jersey providers and residents. This Court should reject that invitation and dismiss Plaintiffs' complaint with prejudice.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. The Medical Aid in Dying for the Terminally Ill Act.

In 2019, New Jersey's Legislature passed the Act to allow "competent adults to make healthcare decisions about whether to have life prolonging medical or surgical means or procedures provided, withheld, or withdrawn." N.J. Stat. Ann. § 26:16-2(a). Effective August 1, 2019, the law establishes "the right of a qualified terminally ill patient, protected by appropriate safeguards, to obtain medication that

the patient may choose to self-administer in order to bring about the patient's humane and dignified death." *Id.* § 26:16-2(a).

In passing the Act, New Jersey became only the eighth state since 1997 to offer MAID to its qualified terminally-ill residents.[1] In states that have not adopted comparable statutes, there is no authority legally distinguishing MAID from assisted suicide—a criminal offense carrying significant penalties, including jail time. Those states include Delaware and Pennsylvania, where Plaintiffs reside.

In Delaware, a person that "intentionally causes another person to commit suicide" is guilty of manslaughter, a class B felony carrying a sentence of two to twenty-five years in prison. 11 Del.C. §§ 632, 4205(b). It is also a class F felony to "promot[e] suicide," defined as "intentionally caus[ing] or aid[ing] another person to attempt suicide," or "intentionally aid[ing] another person to commit suicide." *Id.* § 645. Such a felony is punishable by up to three years' imprisonment. *Id.* § 4205(b).

In Pennsylvania, it is a second-degree felony—punishable by a prison sentence of up to ten years—for any person to "intentionally aid[] or solicit[] another to die by suicide," if that person's conduct actually "causes such suicide or an attempted suicide." 18 Pa.C.S.A. §§ 2505(b), § 1103(2). Even if the individual's

---

[1] Other states where MAID had been authorized include Oregon, Washington, Montana, Vermont, California, Colorado, and Hawaii. MAID was also legalized in the District of Columbia, effective December 20, 2016. MAID subsequently became available in Maine and New Mexico. *See Kligler v. Att'y Gen.*, 198 N.E.3d 1229, 1237 n.5 (Mass. 2022) (collecting sources).

actions do not actually result in suicide or an attempt to commit suicide, any such aid or solicitation is still treated as a second-degree misdemeanor, punishable by up to two years in prison. *See id.* §§ 2505(b), 106(b)(7).

### B. Requirements and Safeguards Imposed Under the Act.

In crafting the Act, the Legislature was aware of these different perspectives. The Act acknowledges that the "public welfare requires a defined and safeguarded process in order to effectuate the purposes of this act." N.J. Stat. Ann. § 26:16-2(c). That process is intended to: "(1) guide health care providers and patient advocates who provide support to dying patients; (2) assist capable, terminally ill patients who request compassionate medical aid in dying; (3) protect vulnerable adults from abuse; and (4) ensure that the process is entirely voluntary on the part of all participants, including patients and those health care providers that are providing care to dying patients." *Id.*

To achieve these goals, the Act lays out detailed parameters to guide patients and providers. For example, the Act ensures that only qualified terminally ill individuals are able to receive medication under the Act. *See, e.g.*, *id.* § 26:16-4, -7 (requirements to request medication and criteria for qualification); § 26:16-5 (forms for valid written medication request); § 26:16-6 (responsibilities of attending physician); § 26:16-8 (determination of patient's capacity); § 26:16-10 (process for requiring medication). The Act also sets protections for patients, providers, and

anyone voluntarily assisting in a request for medication under the Act to ensure they do not suffer reprisals or other adverse effects by virtue of their participation. *See*, *e.g.*, *id.* § 26:16-17 (providing immunity from civil or criminal liability, professional disciplinary action, censure, discipline, suspension, loss of licensure, etc.). And the Act also protects against abuses of MAID, specifying that any provision in a contract, will, insurance policy, annuity, or other agreement, whether written or oral, shall be invalid if it conditions or restricts a person's decision to make or rescind a request for medication under the Act. *See id.* § 26:16-14(a). Similarly, an obligation owing under a contract, will, insurance policy, annuity, or other agreement cannot be affected by (1) the Act, (2) a person's decision to make or rescind a request for medication under the Act, or (3) any other action taken under the Act. *See id.* § 26:16-14(b). Finally, procurement or issuance of a life, health, or accident insurance policy or annuity, or the premium or rate charged for the policy or annuity, cannot be conditioned upon or consider a person's decision to make or rescind a request for medication under the Act. *See id.* § 26:16-14(c).

The Act also requires patients to be New Jersey residents. Proof of residency can be established by furnishing to the attending physician a copy of one of:

      a. a driver's license or non-driver identification card issued by the New Jersey Motor Vehicle Commission;
      b. proof that the person is registered to vote in New Jersey;
      c. a New Jersey resident gross income tax return filed for the most recent tax year; or

> d. any other government record that the attending physician reasonably believes to demonstrate the individual's current residency in this State.

*Id.* § 26:16-11. The residency requirement is reiterated in various other provisions of the Act. *See, e.g., id.* § 26:16-2, -3, -4, -20.

### C. The Parties and Complaint.

Plaintiff Judith Govatos is a 79-year-old Delaware resident diagnosed with Stage IV lymphoma. Compl., D.I. 1 ¶5. According to the Complaint, a bone marrow transplant is her only remaining treatment, but because of her age she is not a candidate for a transplant. *Id.* Because Delaware lacks a MAID statute, she "wishes to have the option of medical aid in dying" here in New Jersey. *Id.*

Plaintiff Andrea Sealy is a 43-year old Pennsylvania resident diagnosed with metastatic breast cancer.[2] *Id.* ¶6. Although she has been receiving treatment and has not been diagnosed as being terminally ill, she alleges she "does not feel fully free to live because Pennsylvania does not yet allow medical aid in dying—making her extremely anxious for when the end eventually comes." *Id.*

Plaintiffs Dr. Paul Bryman and Dr. Deborah Pasik are physicians licensed to practice medicine in New Jersey. *Id.* ¶¶7-8. They argue that the Act's residency

---

[2] Despite the severity of their respective diagnoses, neither Govatos nor Sealy allege in the Complaint that they have been determined to be terminally ill under the Act – i.e., "in the terminal stage of an irreversibly fatal illness, disease, or condition with a prognosis, based upon reasonable medical certainty, of a life expectancy of six months or less." N.J. Stat. Ann. § 26:16-3.

7

requirement unconstitutionally restricts their ability to provide MAID to otherwise qualified terminally ill patients from other states. *Id.*

On August 29, 2023, Plaintiffs sued the Defendants, Governor Philip Murphy, Attorney General Matthew J. Platkin, Acting Health Commissioner Kaitlan Baston,[3] Executive Director of Board of Medical Examiners Antonia Winstead, and Camden County Prosecutor Grace C. MacAulay (all in their official capacities). *See generally* Compl. Their Complaint alleges that the Act's residency requirement violates three separate provisions of the U.S. Constitution: (1) the Privileges and Immunities Clause of Article IV, § 2, (2) the dormant Commerce Clause of Article I, § 8, and (3) the Equal Protection Clause of the Fourteenth Amendment. *Id.* ¶¶ 59-91. They seek declaratory relief and an order permanently enjoining Defendants from enforcing the Act's residency requirement. *Id.* at 28-29.

This motion to dismiss follows.

## **STANDARD OF REVIEW**

In assessing a motion to dismiss for failure to state a claim, this Court must ask whether Plaintiffs' Complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[3] Dr. Baston replaced Commissioner Judith Persichilli, whom Plaintiffs originally sued. Compl. ¶ 11.

(2007)). To answer that question, the Court may also consider exhibits attached to the Complaint and matters of public record. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). But the Court may not accept Plaintiffs' "legal conclusions," which it must evaluate for itself. *Iqbal*, 556 U.S. at 678. Nor do [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, . . . suffice." *Id.*

## ARGUMENT[4]

## I.   THE ACT DOES NOT VIOLATE THE PRIVILEGES AND IMMUNITIES CLAUSE.

Under the Privileges and Immunities Clause, "[t]he citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." U.S. Const. art. IV, § 2. The Clause is designed to "'strongly . . . constitute the citizens of the United States one people,' by 'plac[ing] the citizens of each State upon the same

---

[4] As an initial matter, the Act does not create criminal liability for violating the residency requirement. *See* N.J. Stat. Ann. § 26:16-18 (listing crimes associated with the Act). The only basis on which Plaintiffs sued Defendant MacAulay, as Camden County Prosecutor, was for "prosecut[ing] all indictable crimes," which do not include residency violations. Compl. ¶ 13. Because Plaintiffs' injuries are not "a direct result of [the Act] and its impending enforcement by [that] defendant[], and declaratory and injunctive relief would [not] eliminate the risk of such injury," *Lewis v. Alexander*, 685 F.3d 325, 338 n.10 (3d Cir. 2012), they fail to allege the redressability prong of standing, and thus all claims against MacAulay should be dismissed for lack of standing, *see, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1111 (10th Cir. 2007) ("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute."); *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (same).

footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.'" *Lunding v. N.Y. Tax Appeals Trib.*, 522 U.S. 287, 296 (1998) (quoting *Paul v. Virginia*, 8 Wall. 168, 180 (1868)). But the Supreme Court has clarified that a State need not "always apply all its laws or all its services equally to anyone, resident or nonresident, who may request it to do so." *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 383 (1978); *see also id.* ("It has not been suggested, however, that state citizenship or residency may never be used by a State to distinguish among persons."). Instead, the Court has "long held that the Privileges and Immunities Clause protects only those privileges and immunities that are 'fundamental.'" *McBurney v. Young*, 569 U.S. 221, 226 (2013) (quoting *Baldwin*, 436 U.S. at 382, 388).

When discrimination against nonresidents burdens a fundamental privilege, courts then ask whether "the government does not have a 'substantial reason' for the difference in treatment" and "the discrimination practiced against the nonresidents does not bear a 'substantial relationship' to the government's objectives." *A.L. Blades & Sons, Inc. v. Yerusalim*, 121 F.3d 865, 870 (3d Cir. 1997) (quoting *Toomer v. Witsell*, 334 U.S. 385, 396 (1948); *Supreme Court of N.H. v. Piper*, 470 U.S. 274, 284 (1985)). That further inquiry is necessary because, "[l]ike many other constitutional provisions, the privileges and immunities clause is not an absolute." *Toomer*, 334 U.S. at 396. As the Supreme Court has emphasized, "[e]very inquiry

10

under the Privileges and Immunities Clause 'must . . . be conducted with due regard for the principle that the States have considerable leeway in analyzing local evils and in prescribing appropriate cures.'" *United Bldg. & Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden*, 465 U.S. 208, 222-23 (1984) (quoting *Toomer*, 334 U.S. at 396).

The Act does not offend the Privileges and Immunities Clause. The residency requirement does not burden any fundamental privilege. And even if it did, the distinction the Legislature drew both has a substantial reason and bears a substantial relationship to the State's objectives.

### A. The Residency Requirement Does Not Burden A Fundamental Privilege.

As mentioned, "the Privileges and Immunities Clause protects only those privileges and immunities that are 'fundamental.'" *McBurney*, 569 U.S. at 226 (quoting *Baldwin*, 436 U.S. at 382, 388). A privilege is fundamental when it "bear[s] upon the vitality of the Nation as a single entity" and is "basic to the maintenance or well-being of the Union," such that denying it to non-residents would "hinder the formation, the purpose, or the development of a single Union of those States." *Baldwin*, 435 U.S. at 383, 388; *see also A.L. Blades*, 121 F.3d at 870 (assessing whether a right is necessary "to the promotion of interstate harmony"). Because blackletter law confirms MAID is not such a right, New Jersey's limiting MAID to residents does not violate the Privileges and Immunities Clause.

11

*McBurney* is crystal clear that only fundamental rights are protected by the Privileges and Immunities Clause. There, the Court considered a Privileges and Immunities challenge to Virginia's Freedom of Information Act (FOIA), which allowed Virginians to inspect and copy public records but granted non-Virginians no such rights. 569 U.S. at 224. The Court rejected a claim that "access to public information" was protected by the Clause as a fundamental right, and, as a result, Virginia does not violate it when restricting FOIA access to its own residents. *Id.* at 227, 232. As the Court explained, "there is no constitutional right to obtain all the information provided by FOIA laws," *id.* at 232 (collecting cases), and since "[n]o such right was recognized at common law" or in early American history, it "certainly [could] not be said that such a broad right has 'at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign,'" *id.* at 233 (quoting *Corfield v. Coryell*, 6 F.Cas. 546, 551 (No. 3,230) (CCED Pa. 1825)). Especially given that "FOIA laws are of relatively recent vintage," with the first one enacted in 1966, there could be "no contention that the Nation's unity foundered in their absence, or that it is suffering now because of the citizens-only FOIA provisions that several states have enacted." *Id.* at 234. At bottom, a right to access public information was not "basic to the maintenance or well-being of the Union," *id.* (quoting *Baldwin*, 436 U.S. at

12

388), so a State's "refusal to furnish [certain] information [to non-residents] did not abridge any constitutionally protected privilege or immunity[,]" *id.* at 224.

     *McBurney* compels the same conclusion here. The Supreme Court has expressly held that there is no fundamental right to MAID in *Washington v. Glucksberg*, 521 U.S. 702 (1997), where it confirmed that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause[,]" *id.* at 728. Indeed, *no* appellate court "has concluded that physician-assisted suicide constitutes a fundamental right" under state constitutional law either. *Kligler v. Att'y Gen.*, 198 N.E.3d 1229, 1255, 1258 (Mass. 2022) (distinguishing right to MAID from right to refuse medical treatment); *accord Myers v. Schneiderman*, 85 N.E.3d 57, 65 (N.Y. 2017) (per curiam) (collecting cases). And "for over 700 years, the Anglo-American common-law tradition has punished or otherwise disapproved of both suicide and assisting suicide." *Glucksberg*, 521 U.S. at 711-16; *see also Kligler*, 198 N.E.3d at 1254 (describing how that tradition still continues in many states today). Only recently have certain states broken the mold in making policy decisions to allow MAID; the first MAID statute of the eleven state statutes that currently exist, Oregon's, took effect in 1997. Given the short pedigree of MAID statutes, Plaintiffs cannot "conten[d] that the Nation's unity foundered in their absence, or that it is suffering now because of the citizens-only [MAID] provisions that several States have enacted." *McBurney*, 569 U.S. at 234.

Because such a privilege is not fundamental, New Jersey's "refusal to furnish" MAID services to non-residents does not "abridge any constitutionally protected privilege or immunity." *Id.* at 224. This Court's analysis need go no further.

Perhaps sensing this inescapable conclusion, Plaintiffs try to frame the privilege at stake in less precise terms, invoking the rights to "medical care" and "travel." Compl. ¶¶ 61-68. Putting aside that adopting these theories undermines the holdings of *McBurney* and *Glucksberg*, these attempts fail on their own terms as well. MAID is *not* the type of medical care contemplated by the Privileges and Immunities Clause. And the right to travel contemplated by the Clause entitles sojourners only to those privileges that are themselves fundamental.

As to the former argument, MAID is *not* the kind of medical care that receives constitutional protection. The Supreme Court has held that the Privileges and Immunities Clause prevents a State from "limit[ing] to its own residents the *general medical care* available within its borders." *Doe v. Bolton*, 410 U.S. 179, 183-84, 200 (1973) (emphasis added). But that phrase is key. As the Supreme Court has noted, general medical care does not refer to just any medical action performed by a doctor, but to the care that supports a "basic necessity of life." *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 259 (1974). And the Supreme Court also gave the rationale for that distinction, noting "governmental privileges or benefits *necessary to basic sustenance* have often been viewed as being of greater constitutional significance

than less essential forms of governmental entitlements." *Id.* (emphasis added). But that is obviously not what MAID does or is designed to do: it does not provide care that is "*necessary to basic sustenance*" and thus does not fit within the constitutional bucket that Plaintiffs seek to place it. That is why the Supreme Court can view both *Memorial Hospital* (describing right to medical care necessary to basic sustenance) and *Glucksberg* (no right to MAID) as simultaneously being good law. And it is also why medical professional societies that have a duty to support basic life-giving care do not believe they have a medical duty to provide MAID. *See Kligler*, 198 N.E.3d at 1255; *accord Vacco v. Quill*, 521 U.S. 793, 800-01 & n.6 (1997); *Myers*, 85 N.E.3d at 63. The right to medical services does not include MAID.

Nor can Plaintiffs claim that the residency requirement burdens a standalone right to travel. The right to travel has three different components: (1) "the right of a citizen of one State to enter and to leave another State"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999). Plaintiffs cannot and do not allege that limiting MAID services to residents "impose[s] [an] obstacle" to their "entry into [New Jersey]," so the residency requirement "does not directly impair the exercise of the right to free interstate movement." *Id.* at 501; *see also Zobel v. Williams*, 457 U.S. 55, 60 n.6

15

(1982) (explaining that this component "protect[s] persons against the erection of actual barriers to interstate movement"). Nor, of course, have they elected to become permanent residents of New Jersey. Thus, the only component of the right to travel at issue is the second: being "treated as a welcome visitor" in New Jersey. *Saenz*, 526 U.S. at 500.

That component is "expressly protected by the text of the Constitution": the Privileges and Immunities Clause. *Id.* at 501. "Thus, by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits." *Id.* at 501 (quoting U.S. Const. art. IV, § 2). But as already explained above, the privileges and immunities protected by the Clause are only those that are "fundamental." *Id.* at 501 n.14 (quoting *Corfield*, 6 F.Cas. at 551-52); *accord McBurney*, 569 U.S. at 226. So while that component of the right to travel "provides important protections for nonresidents who enter a State whether to obtain employment [or] to procure medical services," *Saenz*, 526 U.S. at 502, it cannot by itself bootstrap a non-fundamental privilege like MAID services into constitutional protection, *see Peterson v. Martinez*, 707 F.3d 1197, 1213 (10th Cir. 2013) (holding that a plaintiff's welcome-visitor claim "is coterminous with his privileges and immunities argument"). That makes sense: the non-residents in, say, *Baldwin* seeking equal access to recreational elk hunting in Montana could not

16

transform that activity into a fundamental right simply by describing their claim as one bearing on the right to travel. *See* 436 U.S. at 383-88. So too here.

Ultimately, access to MAID is not a fundamental right. It neither "bear[s] upon the vitality of the Nation as a single entity" nor is it "basic to the maintenance or well-being of the Union." *Id.* at 388. Rather, however important as a policy to the residents of New Jersey, the provision of MAID is a service that the New Jersey Legislature need not "apply . . . equally to anyone, resident or nonresident, who may request it." *Id.* at 383. Because the State's "citizens-only [MAID] provision" does "not abridge any constitutionally protected privilege or immunity," this Court should dismiss Plaintiffs' Privileges and Immunities Clause claim on that ground alone. *McBurney*, 569 U.S. at 224, 237.

## B. The Residency Requirement Serves, and Is Substantially Related to, Substantial Government Interests.

Even if the Act's residency restriction implicates a fundamental privilege, that "does not end [the] inquiry." *Piper*, 470 U.S. at 284. The Privileges and Immunities Clause "does not preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Id.* The Legislature's decision to offer MAID only to residents can be justified (1) by the State's substantial interests in protecting its medical professionals

17

and others assisting in providing MAID from criminal and civil liability and (2) by the fact that the State can only ensure that New Jersey residents seeking MAID do so without undue pressures, but cannot so ensure for out-of-state residents. And the residency requirement is substantially related to those interests.

  1. *Substantial Interests Support The Residency Requirement.*

A substantial reason for differentiating between residents and non-residents must be "more than a cursory justification . . . smack[ing] of an effort to 'penaliz[e] the citizens of other States . . . merely because they are such citizens.'" *Lunding*, 522 U.S. at 315 (quoting *Toomer*, 334 U.S. at 408 (Frankfurter, J., concurring)). In other words, the reason for the distinction cannot be "the mere fact that they are citizens of other States"; there must be some "indicat[ion] that non-citizens constitute a peculiar source of the evil at which the statute is aimed." *Toomer*, 334 U.S. at 398. So the State must "explain how nonresident [MAID patients] [are] different, irrespective of their state of residency, from resident [MAID patients], and why a different state residency justified the discriminatory treatment." *A.L. Blades*, 121 F.3d at 875.

The State has "valid independent reasons" for distinguishing between New Jersey residents and non-residents seeking MAID services. *Toomer*, 334 U.S. at 396. ***First***, most other states continue to criminalize MAID services. *See, e.g.*, *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 280 (1990) ("[T]he majority of states

in this country have laws imposing criminal penalties on one who assists another to commit suicide."); *Kligler*, 198 N.E.3d at 1254. Were New Jersey to open MAID services to all comers, it risks opening up the State's medical professionals and residents assisting in providing MAID to liability in those other states.[5] Such an outcome would likely chill those providers from giving MAID services altogether and nullify the Act's stated premise that it "is necessary for the welfare of the State and *its residents*." N.J. Stat. Ann. § 26:16-2(d) (emphasis added). Put simply, non-residents seeking MAID services "present a distinct significant harm" to the provision of MAID in New Jersey. *A.L. Blades*, 121 F.3d at 875.

Concern for MAID providers is far from speculative. Relevant here, Delaware and Pennsylvania are among the forty that have not yet recognized a right to access MAID. Instead, they punish intentionally causing or aiding another's suicide with years of imprisonment. *See supra* at 4-5. And both states extend criminal liability beyond their own borders. In Delaware, a person may be convicted for an offense when either his "conduct or *the result which is an element of the offense* occurs within Delaware." 11 Del.C. § 204(a)(1) (emphasis added). So too in Pennsylvania.

---

[5] As the Act makes clear, even non-medical professionals can and will assist in providing MAID services. They include those who "communicate" the patient's health care decisions to medical professionals (N.J. Stat. Ann. § 26:16-3, -5), "witness[]" the patient's written request for medication (§ 26:16-5), pick up the patient's medication as an agent (§ 26:16-6), or accompany the patient when she chooses to self-administer the medication (§ 26:16-6(a)(7), -17(a)(1)).

*See* 18 Pa.C.S.A. § 102(a)(1). Suicide is a result that is an element of several offenses in those states. *See, e.g.*, 11 Del.C. §§ 632(5), 645; 18 Pa.C.S.A. § 2505(b). So New Jersey MAID providers risk criminal liability for patients' deaths occurring in those states.[6] Plus, those providers may also face civil lawsuits from patients' family members or other litigants in their home state alleging that providing MAID constitutes, for instance, patient abuse, neglect, or wrongful death.

The State was keenly aware of the potential liabilities facing medical professionals and others who assist in providing MAID services. That is why it proclaimed that any "person" who has taken "any action . . . in compliance with" the Act "shall not be subject to civil or criminal liability or professional disciplinary action, or subject to censure, discipline, suspension, or loss of any licensure, certification, privileges or membership." N.J. Stat. Ann. § 26:16-17. And it declared that "[a]ny action taken in accordance with the [Act's] provisions shall not constitute

---

[6] Under both states' criminal codes, criminal liability does not apply for conduct occurring outside of those states (e.g. in New Jersey) causing elemental results (e.g. suicide) within those states when such conduct would not constitute an offense had the result also occurred there (e.g. New Jersey)—*unless* the defendant intentionally, knowingly, or even recklessly caused the result within those states. 11 Del.C. § 204(c) (intentionally, knowingly, or recklessly); 18 Pa.C.S.A. § 102(b) (intentionally or knowingly). That caveat is relevant here, for any New Jersey physician who writes a prescription for medication for an out-of-state resident, or any pharmacist who dispenses that medication to the non-resident, necessarily does so with the knowledge that the patient will, in all likelihood, self-administer the medication in their home state. Given that knowledge, those MAID providers would still be risking criminal liability in Delaware and Pennsylvania.

patient abuse or neglect, suicide, assisted suicide, mercy killing, euthanasia, or homicide under any law of this State." *Id.* (citation omitted).

But the State's protective reach goes only so far. Though these immunities are sufficient to protect providers under New Jersey law, they afford providers no protection from the laws of neighboring states. In limiting the patient population to New Jersey residents, the Act effectively insulates providers from the real threat of criminal and civil liability in states that do not distinguish MAID from assisted suicide. If the residency requirement were invalidated, it would directly undermine the Legislature's efforts to protect New Jersey providers.

Without protection, those providers would be chilled from offering the very services that the Act was designed to allow.[7] With the ever-present threat of lawsuits

---

[7] Absent the residency requirement, the risk to providers is even greater with the recent, increased prevalence of telemedicine. While New Jersey law views telemedicine interactions as remaining subject to and governed by the rules, requirements, and standard of care imposed under New Jersey law, this does not mean that providers are immune from liability for violating the prevailing rules and requirements in the patient's "originating site." *See* N.J. Stat. Ann. § 45:1-62; N.J.A.C. 13:35–6B.5. In fact, the American Medical Association ("AMA") takes the position that "[p]hysicians and other health professionals delivering telehealth services must abide by state licensure laws and state medical practice laws and requirements in the state where the patient is located." *See* Am. Med. Assoc., Licensure and Telehealth (2022), *available at* https://www.ama-assn.org/system/files/issue-brief-licensure-telehealth.pdf (last visited January 31, 2024). The provision of MAID (or satisfaction of any of its statutory requirements) through telehealth to a patient in an "originating site" that does not permit MAID would necessarily run afoul of the AMA's position and could constitute conduct occurring in states that ban MAID. *See* 11 Del.C. § 204(a)(1); 18 Pa.C.S.A. § 102(a)(1).

and criminal liability, New Jersey providers would foreseeably (and understandably) be hesitant to consider requests for MAID from out-of-state residents. Indeed, such persistent apprehension of criminal and/or civil liability may disincentivize them from providing MAID at all, depriving these services from otherwise qualified terminally-ill New Jersey residents. After all, provider participation in the Act is strictly voluntary. *See* N.J. Stat. Ann. §§ 26:16-2(c)(4), 26:16-17(c).

***Second***, the State can only ensure that New Jersey residents seeking MAID do so without undue pressures, but cannot so ensure for out-of-state residents. The Act prohibits provisions in contracts, wills, insurance policies, and other agreements from conditioning or restricting a person's decision to make or rescind a request for medication under the Act. N.J. Stat. Ann. § 26:16-14(a). But like the Act's immunity provisions, these provisions only have the force of law in New Jersey. Thus, while they protect the rights of in-state residents who avail themselves of MAID, the Act cannot protect non-residents from the risk of coercion and undue influence.

This has consequences beyond the inability to protect citizens of other states. If New Jersey were to allow individuals to make or rescind requests for MAID while those individuals may be under the influence of third-party pressures like insurance policies or wills, medical providers who participate in the rendering of MAID may become embroiled in subsequent litigation—at the very least, as witnesses. That, too, would have a chilling effect on offering MAID services. *See supra* at 19-21.

The State therefore has a substantial reason to limit the provision of MAID to its own residents. Because providing MAID services to non-residents would lead to significant provider liability and discourage them from offering those services at all, non-residents "are a 'peculiar source of the evil at which the [Act] is aimed.'" *A.L. Blades* (quoting *Toomer*, 334 U.S. at 339).

   2.  *The Residency Requirement Is Substantially Related to the State's Interest in Protecting Those Who Provide MAID.*

Finally, the State must show that discriminating against non-residents "bears a substantial relationship to the State's objective." *Piper*, 470 U.S. at 284. In assessing whether there is such a "close or substantial relationship," a court may "consider[] the availability of less restrictive means." *Id.* But the availability of less restrictive means does not imply that the statute need be the *least* restrictive means; after all, this "inquiry must . . . be conducted with due regard for the princip[le] that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." *Toomer*, 334 U.S. at 397. That is especially true here, where the Act is an exercise of the State's core police power to protect its citizens' health and safety. With those principles in mind, the residency requirement is substantially related to the State's objective to protect MAID providers and, ultimately, the provision of MAID.

   Through the residency requirement, the Act ensures that those who provide MAID services will not subject themselves to liability from the vast majority of

23

states that continue to punish assisted suicide. And it ensures that those who provide MAID services only do so to individuals free of undue influence—which New Jersey law is able to ensure for its own residents only. Thus, medication may be prescribed only if "the qualified terminally ill patient has documented [her] New Jersey residency by furnishing to the attending physician" proof of residency. N.J. Stat. Ann. § 26:16-11. Without that safeguard, MAID providers would expose themselves to serious civil and criminal liability by assisting patients residing in those other states, and could very well choose to opt out from providing MAID services altogether, as is their right. *See id.* § 26:16-17(c). And providers would have no way of ensuring that the patients who seek MAID services are doing so free from external pressures from contracts, wills, insurance provisions, and the like. The residency requirement serves to avoid those ominous outcomes.

The residency requirement is substantially related to the State's objectives, given the considerable leeway the State is afforded to legislate for its citizens' health and safety. As the Supreme Court has reiterated, "[t]hroughout our history the several States have exercised their police powers to protect the health and safety of their citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475. And "[b]ecause these are primarily, and historically, matters of *local concern*, the States traditionally have had *great latitude* under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Id.* (emphases added) (cleaned up);

24

*see also Zahl v. Harper*, 282 F.3d 204, 210-11 (3d Cir. 2011) ("New Jersey has a heavy and traditional interest in regulating the practice of medicine within its borders."). Here, the Act expressly "requires a defined and safeguarded process in order to effectuate [its] purposes" which will "guide health care providers and patient advocates who provide support to dying patients" and "assist capable, terminally ill patients who request compassionate [MAID]." N.J. Stat. Ann. § 26:16-2(c). Because the Act falls well within the State's classic power to promote its citizens' health and safety, the residency requirement is worthy of the "considerable leeway" given the State to address "local" matters, *Toomer*, 334 U.S. at 397.

* * *

The State recognizes Plaintiffs' strong desire to dictate the terms of their own death. But nothing in the Privileges and Immunities Clause requires the State to offer MAID to citizens across the nation, especially when doing so would impose serious harms on New Jersey's very ability to protect its own citizens, including in ensuring MAID access. This Court should dismiss Plaintiffs' claim with prejudice.

## II.   THE ACT DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE.

Plaintiffs further allege that the Act violates the dormant Commerce Clause. Compl. ¶¶ 73-81. Under the Commerce Clause, Congress has the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "This clause also has an implied requirement (often called the 'negative' or 'dormant' aspect of

the clause) that states not 'mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Cloverland–Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261 (3d Cir. 2006) (citation omitted). The Clause "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (cleaned up).

Plaintiffs' dormant Commerce Clause claim fails first because the Act does not implicate the Clause at all, let alone directly regulate interstate or discriminate against interstate commerce. And even if it were to implicate the dormant Commerce Clause, the Act fits well within the State's constitutional authority.

## A.   The Act Does Not Implicate the Dormant Commerce Clause.

Simply put, "this case is not governed by the dormant Commerce Clause." *McBurney*, 569 U.S. at 236. *McBurney*, once again, is instructive. There, a California resident whose business requested real estate tax records from state and local governments was denied such a request under Virginia's citizens-only FOIA law. *Id.* at 225. He claimed that the statute's residency requirement violated the dormant Commerce Clause. *Id.* at 234.

The Supreme Court rejected his claim because "Virginia's FOIA law neither 'regulates' nor 'burdens' interstate commerce; rather, it merely provides a service to

26

local citizens that would not otherwise be available at all." *Id.* at 235. The case was thus unlike others in which the Court found a dormant Commerce Clause violation, where "the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *Id.* (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806 (1976)). Indeed, the case was "most properly brought under the Privileges and Immunities Clause: It quite literally poses the question whether Virginia can deny out-of-state citizens a benefit that it has conferred on its own citizens." *Id.* at 236. Because the lawsuit did "not pose the question of the constitutionality of a state law that interferes with an interstate market through prohibition or burdensome regulations," the dormant Commerce Clause was inapplicable. *Id.*

*McBurney* compels the same conclusion here. The Act neither prohibits access to any interstate market of MAID nor imposes a burdensome regulation on that market. Instead, it merely establishes "a service to local citizens that would not otherwise be available at all." *Id.* at 235. Unlike other forms of medical care, MAID is available only because the State allows it to be. *See, e.g.*, *Cruzan*, 497 U.S. at 280 (observing that "the majority of States" criminally punish MAID even today). So, as in *McBurney*, Plaintiffs' claim is really one under the Privileges and Immunities Clause, asking "whether [New Jersey] can deny out-of-state citizens a benefit that it has conferred on its own citizens." 569 U.S. at 236. As explained above, the State

can. *See supra* at 9-26. But in any event, because the Act does not "interfere[] with an interstate market through prohibition or burdensome regulations," the dormant Commerce Clause does not apply at all. *Id.* at 236.

### B. The Act Satisfies the *Pike* Balancing Test.

"Even shoehorned into [the] dormant Commerce Clause framework," *McBurney*, 569 U.S. at 236, Plaintiffs' claim would fail. To determine whether a statute violates the dormant Commerce Clause, courts first ask "whether heightened scrutiny applies, and, if not, then ... whether the law is invalid under the *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), balancing test." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 373 (3d Cir. 2012). Heightened scrutiny is appropriate if a law "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).[8] "Discriminatory laws motivated by simple economic protectionism are subject to a virtually per se rule of invalidity, which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S.

---

[8] Plaintiffs allege only that the Act "discriminates against interstate commerce on its face" by "restrict[ing] an out-of-state resident's ability to access New Jersey medical care." Compl. ¶ 78. They do not allege that the Act's effect is to favor New Jersey economic interests over out-of-state interests.

330, 338-39 (2007) (cleaned up). On the other hand, under *Pike*, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142 (citation omitted).

As an initial matter, a restriction on MAID availability would not be subjected to heightened scrutiny because it does not directly regulate or discriminate against interstate commerce. The Act is not one of "simple economic protectionism." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978). After all, the Act does not aim to protect New Jersey's economic interests in prohibiting out-of-state MAID seekers from participating in commercial transactions relating to MAID services in New Jersey; indeed, it is the opposite of protectionism. Instead, the Act is focused intensely on the "public welfare," seeking to "assist capable, terminally ill patients who request compassionate medical aid in dying" and "guide health care providers and patient advocates who provide support to [those] dying patients." N.J. Stat. Ann. § 26:16-2. The residency requirement is instrumental to those goals. *See supra* at 23-25. So where, as here, a "State legislates to safeguard the health and safety of its people," meaning there is "no patent discrimination against interstate trade" and the

29

burdens on interstate commerce are "incidental," a "much more flexible approach" under *Pike* is appropriate. *City of Philadelphia*, 437 U.S. at 623-24.[9]

    1. *The Act Regulates Evenhandedly to Effectuate a Legitimate Public Purpose.*

As established above, the Act is essential to effectuate legitimate, local public interests. *See supra* at 18-25. The Act protects MAID providers in New Jersey from being subject to criminal and civil liability for providing MAID to residents of other states that do not distinguish MAID from assisted suicide; it also ensures that MAID patients were not coerced or unduly influenced. Those protections ensure that providers are not dissuaded from offering MAID even to residents. So the Act seeks to preserve "the welfare of the State and its residents." N.J. Stat. Ann. § 26:16-2(d).

    2. *The Act's Effects on Interstate Commerce, If Any, Are Incidental.*

The incidental burdens that courts "assess under *Pike* consist of 'the degree to which the state action incidentally discriminates against interstate commerce relative to intrastate commerce.'" *Heffner v. Murphy*, 745 F.3d 56, 73 (3d Cir. 2014) (quoting *Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 406 (3d Cir. 1987)). Plaintiffs' claim relies on two categories of purported burdens: those that fall on patients like Plaintiffs Govatos and Sealy and those that fall on providers like Plaintiffs Bryman and Pasik.

---

[9] Even were heightened scrutiny to apply, the State has shown that it "has no other means to advance a legitimate local purpose," *United Haulers*, 550 U.S. at 338-39. *See supra* at 23-25.

Some are purely conclusory and cannot support this constitutional challenge. Others demonstrate, at most, a negligible impact on interstate commerce.

Begin with their claims as to Plaintiffs Govatos and Sealy. Plaintiffs argue that the Act prevents them "from receiving specific medical care after crossing State lines into New Jersey, even though they would otherwise qualify for this care."[10] Compl. ¶76; *see also id.* (arguing this "prevent[s] them from transacting in interstate commerce by restricting access to the purchase of medical care"). That argument overlooks the blackletter principles that "incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people," *City of Philadelphia*, 437 U.S. at 623-24, and it is premised on an overly commodified conception of MAID. MAID is not a transaction between buyer and seller or a service to be gamely rendered to a willing consumer. MAID is a highly regulated exercise of end-of-life decision-making involving multiple specific steps, the satisfaction of numerous strict requirements, and the involvement of several stakeholders. The extent of these strict regulatory requirements sets MAID apart from conventional medical care purchased or transacted, even within the context of end-of-life decision making.

---

[10] Defendants note that both Plaintiffs Govatos and Sealy have acknowledged that they have not been diagnosed as being terminally ill, as defined under the Act. *See* Compl. ¶¶ 30, 34. Therefore, without minimizing the undisputed seriousness of their diseases, their factual allegation that they would both qualify for MAID but for the residency requirement is not strictly accurate.

31

Moreover, as the Legislature itself recognized, MAID represents a profoundly complex and intimate expression of personal autonomy. Certainly, it unfolds within the context of a doctor-patient relationship, and must without exception satisfy all of the medical criteria necessary to request and receive medication under the Act. But the choice to seek and receive MAID transcends a routine transaction for "medical care" between patient and physician. It elicits the input and assistance of friends, family, and members of the community, culminating in an autonomous choice made in alignment with the goals, values, and deeply held beliefs of each individual patient. And yet, Plaintiffs' constitutional claim works only if the Court embraces an alternative, reductive view of MAID—one that treats it as a purely transactional affair in the marketplace. In short, "[a]ny burden imposed on interstate commerce by this regulatory scheme is clearly incidental to its main goal of protecting the health and safety of [New Jersey] residents." *Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 400 (9th Cir. 1995).

Govatos and Sealy's alternate argument—that "the Act substantially burdens interstate commerce by discouraging non-residents from traveling to New Jersey," Compl. ¶79—also falls short. For one, the discouragement of travel contemplated by the dormant Commerce Clause involves "substantially increas[ing] the cost of" the interstate movement of goods, and "slow[ing] the movement of goods in interstate commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 445

(1978). Plaintiffs do not and cannot allege such discouragement here. For another, and more fundamentally, the Act does not discourage non-residents from traveling to New Jersey. That the Act declines to extend the provision of MAID to such non-residents has no bearing on their decision to travel into the State. Before the Act, no one traveled to New Jersey to seek MAID, for such services were unavailable to all. Plaintiffs fail to allege why the provision of benefits to New Jersey residents alone dissuades them from entering a state that never offered those benefits to them anyway. Their alleged discouragement is conclusory.

The claims with respect to Plaintiffs Bryman and Pasik also fail to satisfy the dormant Commerce Clause's high bar. The Complaint alleges that the Act "prevents them from providing specific medical services to existing patients crossing State lines from other States to New Jersey." Compl. ¶77. Specifically, they claim that the Act prevents them "from offering consultation to prospective out-of-state patients who would otherwise procure their [MAID] services." *Id.* But Plaintiffs overstate the limits the Act imposes on their practices. Under the Act, physicians are free to see non-resident patients and provide the full spectrum of care they normally would provide, including diagnosing patients as terminally ill, ordering imaging, discussing prognoses and available treatment options (including palliative care, comfort care, hospice care, and pain control options), prescribing any necessary and appropriate medications, and providing any follow-up care. The sole limitation imposed by the

Act is that New Jersey providers cannot qualify non-residents as terminally ill for purposes of a request for MAID and cannot prescribe any MAID medication.

Removing this single, final option from providers' menu of other routine, effective interventions also has no material impact on interstate commerce. By its very nature, MAID is an option of last resort, appropriate only for a specific subset of patients who meet enumerated criteria. Given the Act's strict requirements, any prescriptions for MAID medication would logically represent a small total cohort of cases and thus a small portion of medical commerce—both in absolute terms and in proportion to the course of treatment recommended and prescribed by physicians. Indeed, the latest available evidence confirms this. From the Act's effective date in August 2019 through 2022, 186 MAID cases have been filed with the Office of the Chief State Medical Examiner (OCSME). *See* N.J. Dept. of Health, N.J. Medical Aid in Dying for the Terminally Ill Act 2022 Data Summary at 9, *available at* https://www.nj.gov/health/advancedirective/documents/maid/MAidAnnualReport2022.pdf (last accessed January 31, 2024).[11] Those 186 individuals were empowered by the Legislature to direct the course of their end of life care, and also represent a

---

[11] The Court may take judicial notice of published government statistics. *See Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 373 (D.N.J. 2019) (noting that a "Court may consider matters of public record without converting the motion to dismiss into a motion for summary judgment"). Note, data capturing MAID cases reported in 2023 is incomplete and unavailable.

sliver of the many thousands of patients—residents and non-residents alike—tended to by New Jersey medical professionals over those three years.

Plaintiffs also propose that "the Act substantially burdens interstate commerce by discouraging physicians practicing in New Jersey from attending to patients who do not meet the requirements of New Jersey residency." Compl. ¶ 79. This too is predicated on a troubling and speculative premise—that a physician would decline to see out-of-state patients, discuss available options, or provide the full range of available treatment and support simply because that physician cannot also prescribe MAID for them. And to the extent that such "discouragement" is even measurable, given the relatively small pool of patients that could plausibly pursue MAID, any impact on interstate commerce would be *de minimis*. *See Tolchin v. Supreme Court of N.J.*, 111 F.3d 1099, 1119 (3d Cir. 1997) (emphasizing "that those most burdened [by a challenged action] do not constitute a very large class"). Plaintiffs include no allegations that plausibly support any contrary conclusion.

3. *Any Incidental Burden Imposed on Commerce By the Act Is Not Excessive In Relation to Its Benefits.*

As the above discussion explains, the Act imposes no appreciable burden on interstate commerce. At the very least, no incidental burden clearly exceeds the local benefits advanced by the Act and the residency requirement; instead, the reverse is true. *Cf. id.* at 1110 ("Because this requirement appears to be a substantial burden only for the relatively few nonresident attorneys who reside a great distance from

New Jersey, we do not find that such a burden clearly outweighs the benefits promoted by this requirement."). Because the Act easily satisfies the *Pike* balancing test, Plaintiffs' challenge under the dormant Commerce Clause fails and should be dismissed with prejudice for this second independent reason.

## III.   THE ACT DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE.

Plaintiffs' claim that the Act violates the Fourteenth Amendment's Equal Protection Clause, Compl. ¶¶ 82-91, fares no better. Under the Equal Protection Clause, only a legislative classification that "trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage ... must meet the strict scrutiny standard, under which [the] law must be narrowly tailored to further a compelling government interest." *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013) (quoting *Schumacher v. Nix*, 965 F.2d 1262, 1266 (3d Cir.1992)). But if, instead, a "classification or distinction neither burdens a fundamental right nor targets a suspect class," courts will "uphold [it] so long as it bears a rational relation to some legitimate end." *Vacco*, 523 U.S. at 800.

The Act's residency requirement neither burdens a fundamental right nor targets a suspect class. As discussed at length, access to MAID is not a fundamental right. *See Vacco*, 521 U.S. at 799 ("New York's statutes outlawing assisting suicide . . . [do not] infringe fundamental rights."). Nor does the fundamental right to medical services include MAID. *See supra* at 11-14. And the residency requirement

36

does not burden the fundamental right to travel, because the only component of that right at issue—the right to be treated as a welcome visitor—does not implicate any other fundamental privilege or immunity in this case. *See supra* at 15-17. Indeed, that no fundamental privilege is burdened means that no fundamental rights under the Fourteenth Amendment are either, because "[t]he Privileges and Immunities Clause protects more than those rights which are considered fundamental individual rights protected by the Fourteenth Amendment." *Friedman v. Supreme Court of Va.*, 822 F.2d 423, 426 (1987) (4th Cir. 1987).

Moreover, residency status is not a suspect class. For instance, in *Baldwin*, the Supreme Court noted that "a differential in cost between residents and nonresidents is not in itself invidious or unconstitutional," and proceeded to apply rational basis review to that difference. 436 U.S. at 390-91 & n.24 (explaining that the state's classification was not "otherwise invidious discrimination"). Other courts have followed suit. *See, e.g.*, *Whiting v. Town of Westerly*, 942 F.2d 18, 23 (1st Cir. 1991); *Drake v. Gordon*, 848 F.2d 701, 707-08 (6th Cir. 1988); *Hawaii Boating Ass'n v. Water Transp. Facilities Div., Dep't of Transp., State of Hawaii*, 651 F.2d 661, 666 (9th Cir. 1981). This Court should not diverge from that consensus.

Because the Act neither implicates a fundamental right nor discriminates against any protected class, the residency restriction need only satisfy rational basis review, requiring that the restriction be rationally related to a legitimate government

interest. With such a standard, the restriction "bear[s] a strong presumption of validity," and Plaintiffs "have the burden to negative every conceivable basis which might support it." *F.C.C. v. Beach Comm'cns, Inc.*, 508 U.S. 307, 314-15 (1993) (internal quotation marks and citation omitted). Given such a deferential standard, the Supreme Court "hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018).

Here, as already established *supra*, that standard is met easily in light of the substantial government interests advanced by the Act's residency requirement. *See supra* at 18-23. Again, the residency requirement is one of multiple safeguards built into the Act to ensure that patients, providers, and anyone voluntarily assisting in a request for medication under the Act do not suffer reprisals or other adverse effects by virtue of their participation. This is clearly a legitimate and valid exercise of the State's police power, particularly in light of "New Jersey's exceedingly strong interest in regulating the practice of medicine in its jurisdiction" as well as "establish[ing] and enforc[ing] health standards." *Zahl*, 282 F.3d at 211.[12] This is obviously essential to protect the liberty and livelihoods of New Jersey's MAID providers and preserve access to MAID services for New Jersey patients.

---

[12] Because the Third Circuit has recognized this interest not merely as legitimate, but as "exceedingly strong," the Act would also withstand strict scrutiny. *See supra* at 23-25 (describing the lack of less restrictive alternatives).

## **CONCLUSION**

The court should dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Francis X. Baker
      Francis X. Baker (107152014)
      Assistant Attorney General

Dated: January 31, 2024