# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| JUDITH GOVATOS, *et al.*, | |
| Plaintiffs, | Case No. 23-cv-12601 (RMB/EAP) |
| v. | **OPINION** |
| PHILIP D. MURPHY, *et al.*, | |
| Defendants. | |

**APPEARANCES:**

Ryan Chabot
David B. Bassett (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Kelsey Quigley (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306

Kevin Díaz (*pro hac vice*)
Amitai Heller (*pro hac vice*)
COMPASSION & CHOICES
101 SW Madison Street, Unit 8009
Portland, Oregon 97207

*On behalf of Plaintiffs Judith Govatos; Andrea Sealy; Dr. Paul Bryman, DO, FACOI,
AGSF, CMD; and Dr. Deborah Pasik, MD, FACR*

Melissa Schaffer, *Assistant Attorney General*
Francis X. Baker, *Deputy Attorney General*
Christopher Ioannou, *Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625

*On behalf of Defendants Philip D. Murphy, Governor of New Jersey; Matthew J. Platkin, Attorney General of New Jersey; Dr. Kaitlan Baston, MD, MSc, DFASAM, Commissioner of the New Jersey Department of Health; Antonia Winstead, Executive Director of the New Jersey Board of Medical Examiners; and Grace C. MacAulay, Prosecutor of Camden County, New Jersey (all in their official capacities)*

**RENÉE MARIE BUMB, Chief United States District Judge:**

In *Glucksberg v. Washington*, 521 U.S. 702, 728 (1997), the Supreme Court determined that medical aid in dying is not a fundamental right protected by the substantive component of the Due Process Clause.  The Court acknowledged then that "Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide." *Id.* at 735.  In so holding, the Court allowed that debate to continue and devolved the issue to the states—permitting the differing judgments of the democratic process. *Id.*  In 2019, after its own decade-long debate, the New Jersey Legislature enacted the New Jersey Medical Aid in Dying for the Terminally Ill Act, P.L. 2019, c. 59 (the "**Act**").  The Act authorizes a "qualified terminally ill patient" to obtain medication that the patient may choose to self-administer to cause the patient's own death.  N.J. STAT. ANN. § 26:16-2(a).  Intending to guide providers and protect vulnerable adults from abuse, the Legislature imposed several safeguards, including a requirement that the terminally ill patient must be a resident of New Jersey to qualify under the Act.  *See*, *e.g.*, *id.* § 26:16-4(a).  Plaintiffs—a group comprising nonresident patients with terminal illnesses and New Jersey physicians—have sued to challenge this residence requirement.  Defendants have filed a Motion to Dismiss.  It is the constitutionality of the Act's residence requirement that is the narrow issue before this Court.

Specifically, this case presents the question whether the State's residence requirement for medical aid in dying violates three provisions of the United States Constitution: (1) the Privileges and Immunities Clause of Article IV, § 2; (2) the

1

dormant Commerce Clause of Article I, § 8; and (3) the Equal Protection Clause of the Fourteenth Amendment.  As far as this Court can discern, it is a matter of first impression.  No other court has addressed whether a state's residence requirement for medical aid in dying violates the Constitution.[1]

At its core, the issue is whether the Constitution *requires* a state to extend to nonresidents a non-fundamental privilege that it affords to its own residents. Notwithstanding a terminally ill person's genuine desire to access medical aid in dying, this Court concludes that the answer is no, the Constitution does not so require.  Here, the New Jersey Legislature determined that access to medical aid in dying should be limited to residents of the State.  Because medical aid in dying "is not basic to the maintenance or well-being of the Union," *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 388 (1978), the Privileges and Immunities Clause does not protect a nonresident's access to it.  Nor does the dormant Commerce Clause govern this case.

---

[1] Facing similar lawsuits challenging their medical-aid-in-dying laws, the States of Vermont and Oregon opted to stop enforcing their residence requirements.  *See* Settlement Agreement ¶ 1, *Bluestein v. Scott*, Case No. 2:22-cv-00160-WKS (D. Vt. Mar. 14, 2023) ("Defendants agree not to enforce the residence requirement [in Vermont's Patient Choice and Control at the End-of-Life Act] as to [terminally ill challenger]"), https://perma.cc/3J87-K3PT; Settlement Agreement at 2, *Gideonse v. Brown*, Case No. 3:21-cv-01568-AR (D. Or. Mar., 28, 2022), ECF No. 20-1 (agreeing that "[t]he State will not apply or otherwise enforce the residency requirement in [Oregon's Death with Dignity] Act"); *see also* Livia Albeck-Ripka, *Vermont Removes Residency Requirement for Medically Assisted Deaths*, N.Y. Times (May 2, 2023), https://www.nytimes.com/2023/05/02/us/vermont-assisted-suicide-nonresidents.html (recognizing the passage of legislation following the *Bluestein* litigation to remove the residence requirement from Vermont's law); Johnny Diaz, *Oregon Ends Residency Requirement for Medically Assisted Deaths*, N.Y. Times (Mar. 29, 2022), https://www.nytimes.com/2022/03/29/us/oregon-suicide-residency.html.

The Act is not driven by "economic protectionism," *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (plurality op.) (explaining that policing against such protectionism "lies at the 'very core' of our dormant Commerce Clause jurisprudence" (citation omitted)); it merely provides access to a service that would not otherwise exist at all, *see McBurney v. Young*, 569 U.S. 221, 235 (2013).  Finally, the Act's residence requirement neither targets a suspect class nor trammels a fundamental right, so it is subject to rational-basis review.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985).  And the residence requirement makes sense:  While medical aid in dying is permitted in New Jersey, it is indistinguishable from the criminal act of assisted suicide in neighboring states.  By limiting the pool of eligible patients to State residents, the requirement is rationally related to the legitimate objective of protecting from out-of-state liability providers and advocates who assist terminally ill patients in seeking medical aid in dying.

Accordingly, for these reasons, as more fully expressed below, the Court will **GRANT** Defendants' pending motion and **DISMISS** this case.

## I.    BACKGROUND

### A.    New Jersey's Medical Aid in Dying for the Terminally Ill Act.

In 2019, the State Legislature enacted the New Jersey Medical Aid in Dying for the Terminally Ill Act, P.L. 2019, c. 59 (the Act).  The Act established "the right of a qualified terminally ill patient, protected by appropriate safeguards, to obtain medication that the patient may choose to self-administer in order to bring about the

patient's humane and dignified death." N.J. STAT. ANN. § 26:16-2(a). And it specified that any action taken in accordance with the Act "shall not constitute suicide or assisted suicide," which otherwise remains illegal. *Id.* § 2C:11-6, *amended by* 2019 N.J. Laws c. 59, s. 28. With the Act's passage, New Jersey became the ninth jurisdiction in the country to permit qualified patients to access "medical aid in dying."[2, 3]

New Jersey's authorization of medical aid in dying was "the product of a near-decade long debate among policy makers, religious organizations, experts in the

---

[2] Some sources refer to "medical aid in dying" using other terms, such as "physician-assisted suicide," "physician aid in dying," "medically assisted suicide," "death with dignity," and "euthanasia." Indeed, the "vast majority of cases and statutes . . . in other jurisdictions . . . use the phrase 'physician-assisted suicide.' " *Kligler v. Att'y Gen.*, 198 N.E.3d 1229, 1237 n.4 (Mass. 2022). However, these terms are not always synonymous. *See, e.g.*, *Medical Aid in Dying Is Not Assisted Suicide, Suicide, or Euthanasia*, COMPASSION & CHOICES, https://compassionandchoices.org/resource/not-assisted-suicide/ [https://perma.cc/3VX5-WNXG] (last visited Aug. 19, 2024) (explaining that euthanasia generally refers to the practice of being administered a lethal agent by *another* person, whereas medical aid in dying generally requires the patient to self-administer the lethal agent). Indeed, the Act explicitly disavows euthanasia. *See* N.J. STAT. ANN. § 26:16-15(a) (providing that "nothing" in the Act "shall be construed to authorize a physician or any other person to end a patient's life by lethal injection, active euthanasia, or mercy killing, or any act that constitutes assisted suicide" in New Jersey). To avoid confusion, the Court adopts the parlance of the parties and employs the phrase, "medical aid in dying," instead of "physician-assisted suicide" or any other term.

[3] There are eleven jurisdictions in the United States that permit medical aid in dying. Listed chronologically by year of initial authorization, they are as follows: Oregon (1994); Washington (2008); Montana (2009); Vermont (2013); California (2015); Colorado (2016); Washington, D.C. (2017); Hawai'i (2018); New Jersey (2019); Maine (2019); and New Mexico (2021). See *States Where Medical Aid in Dying Is Authorized*, COMPASSION & CHOICES, https://compassionandchoices.org/resource/states-or-territories-where-medical-aid-in-dying-is-authorized/ [https://perma.cc/HB8L-HMF3] (last visited Aug. 19, 2024); *see also Kligler*, 198 N.E.3d at 1237 n.5 (collecting sources).

medical community, advocates for persons with disabilities, and patients, among many others." Philip D. Murphy, *N.J. Governor's Statement Upon Signing Assembly Bill No. 1504 (2nd Reprt.)* (Apr. 12, 2019), https://dspace.njstatelib.org/server/api/core/bitstreams/3a40f3cf-d35a-4ce5-92c7-769c2f1a822a/content [https://perma.cc/RSL5-4PCV]. Legislators recognized that the "public welfare requires a defined and safeguarded process" to accomplish the purposes of the Act. N.J. STAT. ANN. § 26:16-2(c). That process is intended to: "(1) guide health care providers and patient advocates who provide support to dying patients; (2) assist capable, terminally ill patients who request compassionate medical aid in dying; (3) protect vulnerable adults from abuse; and (4) ensure that the process is entirely voluntary on the part of all participants, including patients and those health care providers that are providing care to dying patients." *Id.*

Accordingly, to achieve these goals, the Act established a series of guardrails.[4] First and foremost, medical aid in dying is only available to adults of sound mind who have voluntarily expressed a desire to receive end-of-life medication. *Id.* § 26:16-4. To obtain a prescription for such medication, a qualified terminally ill patient must make two oral requests and one written request to the patient's attending physician, subject to certain waiting periods. *Id.* § 26:16-10(a); *see id.* § 26:16-3 (defining "qualified terminally ill patient" to require compliance with the Act to obtain prescription for

---

[4] For a comprehensive overview of the Act's component parts, see *Petro v. Platkin*, 277 A.3d 480, 485–89 (N.J. Super. Ct. App. Div. 2022). Here, the Court limits its review to those aspects of the Act that are most pertinent to Plaintiffs' constitutional challenge.

end-of-life medication). The written request must be in substantially the same form as provided under the statute (see *id.* § 26:16-20) and signed by at least two witnesses. *Id.* § 26:16-5(a). One of those witnesses must be disinterested. *See id.* § 26:16-5(b). Additionally, to write a prescription for end-of-life medication, a physician must, among other requirements, determine that the patient has capacity to seek medical aid in dying, is acting voluntarily, and has six months or less to live because of a terminal illness. *Id.* § 26:16-6(a)(1); *see id.* § 26:16-3 (defining "terminally ill" to mean that the patient is in the "terminal stage of an irreversibly fatal illness, disease, or condition with a prognosis, based upon reasonable medical certainty, of a life expectancy of six months or less"). The attending physician must refer the patient to a consulting physician who must independently confirm the patient's diagnosis and prognosis and determine that the patient is capable and acting voluntarily. *Id.* § 26:16-6(a)(4); *see id.* § 26:16-4(b) (conditions for request for medication).

Furthermore, the Act addresses the impact of medical aid in dying on certain contracts, protecting patients and their beneficiaries. The Act specifies that contracts, wills, insurance policies, annuities, and other agreements cannot condition or restrict a person's decision to "make or rescind a request for medication" under the Act. *Id.* § 26:16-14(a). Similarly, any obligation owing under such instruments cannot be affected by the Act, a person's decision to make or rescind a request for medication under the Act, or any other action taken under the Act. *Id.* § 26:16-14(b). Likewise, procurement or issuance of a life, health, or accident insurance policy or annuity, or

6

the premium or rate charged for the policy or annuity, cannot take into account the making or rescinding of a request for medication under the Act. *Id.* § 26:16-14(c).

The Act also protects providers and others who voluntarily assist in addressing a request for medical aid in dying. For example, such persons are immune from civil and criminal liability or professional disciplinary action for any good faith action taken in substantial compliance with the Act. *See id.* § 26:16-17(a)(1). The Act otherwise establishes criminal liability for altering or forging a patient's request for medication or concealing or destroying a patient's rescission of that request, *see id.* § 26:16-18(a), and coercing or exerting undue influence on a patient, *see id.* § 26:16-18(b). Additionally, there is a catch-all provision specifying that the Act "shall not preclude the imposition of any other criminal penalty applicable under law for conduct inconsistent with the provisions of [the Act]." *Id.* § 26:16-18(e).

Finally, the Act requires patients to be New Jersey residents to qualify for medical aid in dying. *See id.* § 26:16-3 (defining "qualified terminally ill patient" as "a capable adult who is a resident of New Jersey and has satisfied the requirements [of the Act]"). Proof of residence can be established by furnishing to the attending physician a copy of the patient's driver's license, proof that the person is registered to vote in New Jersey, a New Jersey resident gross income tax return filed for the most recent tax year, or any other government record reasonably establishing that the patient is a New Jersey resident. *Id.* § 26:16-11(a)–(d). The residence requirement is reflected in various other provisions of the Act. *See, e.g.*, *id.* § 26:16-4(a) (providing that to request medication under the Act, patient must be an adult resident of New

7

Jersey as established under § 26:16-11); *id.* § 26:16-6(a)(2) (requiring physicians to verify patient's New Jersey residence prior to prescribing end-of-life medication).

## B.    Plaintiffs and the Complaint.

Plaintiffs are a group comprising two non-New Jersey residents with terminal illnesses and two New Jersey physicians.  [Compl. ¶ 1, ECF No. 1.]  As outlined below, see *infra* Section II, they assert that the Act's residence requirement violates three provisions of the United States Constitution.  [*Id.*]

Plaintiff Judith ("Judy") Govatos is a 79-year-old Wilmington, Delaware resident who has been diagnosed with Stage IV lymphoma.  [*Id.* ¶ 5.]  Unfortunately, at her age, she is not a good candidate for a bone marrow transplant and her body cannot withstand additional rounds of chemotherapy.  [*Id.*]  Plaintiff Andrea ("Andy") Sealy is a 43-year-old resident of Philadelphia, Pennsylvania who has been receiving treatment for Stage 4 metastatic breast cancer.  [*Id.* ¶ 6.]  Sealy's cancer had metastasized to her hip and spine.  [*Id.*]  Govatos and Sealy would like the option of accessing medical aid in dying in New Jersey should their suffering become unbearable.  [*See id.* ¶¶ 5–6.]  Neither Delaware nor Pennsylvania permits medical aid in dying.  [*Id.*]  In those states, assisting another to commit suicide is a criminal offense, *see* DEL. CODE ANN. tit. 11, § 632(5) (class B felony of manslaughter to "intentionally cause[] another person to commit suicide"); *id.* § 645 (class F felony to "promot[e] suicide" by "intentionally caus[ing] or aid[ing] another person to attempt suicide" or "commit suicide"); 18 PA. CONS. STAT. § 2505(b) (second-degree felony to

8

"intentionally aid[] or solicit[] another to die by suicide" if conduct actually causes suicide or attempted suicide, and second-degree misdemeanor if not), punishable by a term of imprisonment, *see* DEL. CODE ANN. tit. 11, § 4205(b) (class B felony, two to twenty-five years); *id.* (class F felony, up to three years); 18 PA. CONS. STAT. § 1103(2) (second-degree felony, up to ten years); *id.* § 106(b)(7) (second-degree misdemeanor, up to two years).

Plaintiff Dr. Paul Bryman is a palliative care physician and geriatrician who lives in Pennsauken, New Jersey. [*Id.* ¶ 7.] He has been a medical director at a hospice in Camden County since 2013. [*Id.*] He has prescribed end-of-life medication to New Jersey residents under the Act, and he seeks to treat out-of-state patients similarly without fear of civil or criminal liability. [*Id.*] Likewise, Plaintiff Dr. Deborah Pasik is a New Jersey physician whose practice focuses on treating terminally ill patients. [*Id.* ¶ 8.] Some of her patients have lived out-of-state, and they have sought access to end-of-life medication. [*Id.*] Under the Act's residence requirement, Dr. Pasik must choose between referring these patients to out-of-state healthcare providers or waiting until these patients become New Jersey residents. [*Id.*] Some of her out-of-state patients have died before they could become residents and qualify under the Act. [*Id.*]

## II.    PROCEDURAL HISTORY

On August 29, 2023, Plaintiffs filed this action to challenge the Act's residence requirement, asserting that it violates three provisions of the United States Constitution: (1) the Privileges and Immunities Clause of Article IV, § 2; (2) the

dormant Commerce Clause of Article I, § 8; and (3) the Equal Protection Clause of the Fourteenth Amendment. [*See generally* Compl.] Proceeding under 42 U.S.C. § 1983, Plaintiffs sued Defendants Philip D. Murphy, Governor of the State of New Jersey; Matthew J. Platkin, Attorney General of the State of New Jersey; Dr. Kaitlan Baston,[5] Commissioner of the New Jersey Department of Health; Antonia Winstead, Executive Director of the New Jersey Board of Medical Examiners; and Grace C. MacAulay, Prosecutor of Camden County, New Jersey (all in their official capacities). [*Id.* ¶¶ 9–15.] Plaintiffs seek declaratory and injunctive relief to prevent enforcement of the Act's residence requirement. [*Id.* ¶ 4; *see also id.* at Prayer for Relief.]

On December 20, 2023, Defendants filed a pre-motion letter pursuant to Rule I.A. of this Court's Individual Rules and Procedures advising of their intention to seek dismissal of the Complaint. [ECF No. 16.] After receiving Plaintiffs' responsive letter, [ECF No. 20], the Court determined that a pre-motion conference would not be productive, [Text Order, ECF No. 22]. Defendants filed their pending Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). [ECF No. 23; Defs.' Br. Supp. Mot., ECF No. 23-1 ("**Defs.' Br**").] Plaintiffs timely opposed, [Pls.' Br. Opp'n Mot., ECF No. 25 ("**Pls.' Opp'n**)], and Defendants timely filed their Reply Brief, [Defs.' Reply Br. Supp. Mot., ECF No. 28 ("**Defs.' Reply Br.**")]. As the Motion is fully briefed, it is ripe for adjudication.

---

[5] Plaintiffs originally sued Commissioner Judith M. Persichilli. [Compl. ¶ 11.] Dr. Baston replaced her.

## III.  LEGAL STANDARD

A complaint may be dismissed for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016).  To withstand a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility standard is met when there is enough factual content in the complaint to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

When reviewing the sufficiency of a complaint, a court must accept as true all well-pleaded allegations in the complaint, including all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Evancho v. Fisher*, 423 F.3d 347, 350–51 (3d Cir. 2005).  "However, we disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements."  *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010)).  A court may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record."  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *see also Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## IV.    DISCUSSION

As noted, Plaintiffs challenge the Act's residence requirement as violations of three provisions of the United States Constitution: (1) the Privileges and Immunities Clause; (2) the dormant Commerce Clause; and (3) the Equal Protection Clause of the Fourteenth Amendment.[6]  [*See* Compl. ¶¶ 59–91.]  Seeking the dismissal of these claims, Defendants argue that non-residents are not entitled to access medical aid in dying in New Jersey and that substantial governmental interests justify the State's residence requirement.  [Defs.' Br. at 9–25.]  They also submit that the Act does not implicate the Commerce Clause and, even if it did, the Act satisfies the applicable balancing test.  [*Id.* at 25–36.]  Finally, Defendants contend that Plaintiffs' equal protection claim must be dismissed because the State's justifications for the residence requirement are reasonable and heightened scrutiny is not warranted.  [*Id.* at 36–39.]  The Court considers each claim, and Defendants' principal arguments, in turn.

### A.    Standing.

Before turning to the merits, however, the Court must address one preliminary matter.  Arguing from footnotes, Defendants appear to question Plaintiffs' standing in this action, though they explicitly limit their argument to Plaintiffs' standing to sue Defendant MacAulay on redressability grounds.  [*See* Defs.' Br. at 7 n.2, 9 n.4, 31 n.10.]  It is a half-hearted effort, but because Article III standing is a jurisdictional

---

[6] Because Plaintiffs assert violations of the United States Constitution pursuant to 42 U.S.C. § 1983, this Court can exercise subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

requirement, the Court is obliged to confirm that Plaintiffs have plausibly alleged standing for each claim asserted. *See Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 287 (3d Cir. 2023) (observing that courts " 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party' " (quoting *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 267 (3d Cir. 2016))); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press."). "Article III standing requires a plaintiff to demonstrate: '(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief.' " *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022) (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs have met their burden here. By disposing of Defendants' arguments, the Court explains why.

*First*, Defendants appear to challenge the patient-Plaintiffs' standing because neither established that their illnesses (i.e., Stage IV lymphoma and Stage IV metastatic breast cancer) qualify them as "terminally ill" within the meaning of the Act. [Defs.' Br. at 7 n.2; *see also id.* at 31 n.10 ("their factual allegation that they would both qualify for MAID but for the residency requirement is not strictly accurate" (citing Compl. ¶¶ 30, 34)).] A person is not a "qualified terminally ill patient" unless that patient "is in the terminal stage of an irreversibly fatal illness, disease, or condition

13

with a prognosis, based upon reasonable medical certainty, of a life expectancy of six months or less."  N.J. STAT. ANN. § 26:16-3.

Based on the Complaint's allegations, it is true that Govatos and Sealy have not received a six-month prognosis and do not (yet) qualify as "terminally ill" within the meaning of § 26:16-3.  [*See* Compl. ¶¶ 30, 34.]  Rather, they allege that they are currently suffering the "stress" and "anxiety" of not knowing whether they *could* access medical aid in dying as non-New Jersey residents when their time—sadly but ineluctably—comes.  [*Id.*]  They seek the "peace of mind" of knowing that they could obtain medical aid in dying when their prognoses worsen, and their suffering becomes unbearable.  [*Id.* ¶¶ 27–29, 33–35.]  Because of the seriousness of their illnesses and their credibly alleged intention to seek access to medical aid in dying when their illnesses become terminal, Govatos and Sealy have demonstrated a risk of future harm that is sufficiently imminent and substantial to satisfy Article III, as they argue, [Pls.' Opp'n at 4 n.2].  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 435–36 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." (first citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); then citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983))).

But the Court need not definitively resolve the question because Drs. Bryman and Pasik clearly have standing to challenge the residence restriction on their own and on behalf of similarly situated, terminally ill patients who live out-of-state.  *See Compassion in Dying v. Washington*, 79 F.3d 790, 795 (9th Cir. 1996) (en banc)

(explaining that case was not rendered moot by death of terminally ill patient-plaintiffs because physician-plaintiffs had standing to assert rights of terminally ill patients in general), *rev'd on other grounds sub nom. Washington v. Glucksberg*, 521 U.S. 702 (1997); *Singleton v. Wulff*, 428 U.S. 106, 117–18 (1976) (physician standing on behalf of women patients in general to challenge Missouri abortion law); *see also Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 377 n.14 (1978) (considering challenge under the Privileges and Immunities Clause where district court only confirmed that two of five nonresident plaintiffs had standing). Thus, Plaintiffs have established standing "for each claim [they] seek[] to press." *Cuno*, 547 U.S. at 352.

As a result, the Court need not address Plaintiffs' contention that the capable-of-repetition-yet-evading-review doctrine applies. [Pls.' Opp'n at 4 n.2 (citing *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911)).] In any case, it is an exception to mootness, *Lutter v. JNESO*, 86 F.4th 111, 131 (3d Cir. 2023), not a basis to establish standing where it never existed. Invoking the doctrine in *Roe v. Wade*, the Supreme Court recognized that a suit by a pregnant woman challenging a state law limiting access to abortion was unlikely to be decided before the pregnancy ended one way or another. 410 U.S. 113, 125 (1973), *overruled on unrelated grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). But the woman challenging the state law was nevertheless pregnant when the suit began, so mootness did not render her dispute nonjusticiable. *Id.*

15

*Second*, Defendants seek to dismiss all claims against Defendant MacAulay for lack of standing on redressability grounds. [Defs.' Br. at 9 n.4.] They submit that the Act does not create criminal liability for violating the residence requirement and that the only basis on which Defendant MacAulay has been sued is for "prosecut[ing] all indictable crimes." [*Id.* (quoting Compl. ¶ 13).] Thus, they contend, declaratory and injunctive relief would not redress the physician-Plaintiffs' fear of prosecution. [*See id.*] That's wrong. To establish standing in the context of a pre-enforcement challenge, a plaintiff must demonstrate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citation omitted). The redressability requirement merely ensures that "the asserted injury-in-fact is capable of resolution in a manner consistent with the traditional understanding of the judicial process." *Lutter*, 86 F.4th at 128.

Here, the Act unambiguously requires patients to be New Jersey residents and attending physicians to confirm their residence. *See, e.g.*, N.J. STAT. ANN. §§ 26:16-4(a), 26:16-6(a)(2). And the Act specifies that it does not "preclude the imposition of any other criminal penalty applicable under law for conduct inconsistent with the provisions of [the Act]." *Id.* § 26:16-18(e). Accordingly, as they argue, [Pls.' Opp'n at 3 n.1], Drs. Bryman and Pasik face a realistic risk of liability under the Act if they were to prescribe end-of-life medication to out-of-state patients, and neither Defendant MacAulay nor any other Defendant has suggested that they would not enforce the residence requirement with the full force of law. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (noting relevance of Government's refusal to disavow

16

prosecution); *cf. Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (Posner, J.) (explaining that, in pre-enforcement challenge to statute assertedly abridging freedom of speech, plaintiff need not show that authorities threatened to prosecute him because "the threat is latent in the existence of the statute"). They need not "await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188 (1973), *abrogated on unrelated grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Their requested relief—a declaration that the residence requirement is unconstitutional and an accompanying order enjoining Defendants (including MacAulay) from enforcing the requirement, [see Compl. at Prayer for Relief]—would clearly redress their asserted injuries. *See Lewis v. Alexander*, 685 F.3d 325, 338 n.10 (3d Cir. 2012) (observing that causation and redressability prongs satisfied because the plaintiffs' injuries were "a direct result of [the statute] and its impending enforcement by defendants, and declaratory and injunctive relief would eliminate the risk of such injury"). Thus, Drs. Bryman and Pasik have standing to challenge the residence requirement. *See Shavelson v. Bonta*, 608 F. Supp. 3d 919, 926 (N.D. Cal. 2022) (finding physicians had standing to challenge self-administration requirement of California medical-aid-in-dying law as violative of the Americans with Disabilities Act because of potential for criminal liability).

    In sum, the Court confirms that Plaintiffs have standing for each claim they assert challenging the Act's residence requirement. This constitutional controversy is clearly justiciable, so the Court turns to the merits.

**B.    Constitutional Claims.**

**1.    Count I:  Privileges and Immunities Clause.**

In their first cause of action, Plaintiffs assert that the Act's residence requirement violates the Privileges and Immunities Clause.  [Compl. ¶¶ 59–72.]  Seeking to dismiss the claim, Defendants argue that the residence requirement does not burden a fundamental privilege protected by the Clause and that substantial governmental interests justify the residence distinction.  [Defs.' Br. at 9–25.]  Defendants emphasize that there is no fundamental right to medical aid in dying.  [*Id.* at 13 (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)).]  In opposition, Plaintiffs submit that the Act's residence requirement burdens the fundamental right to interstate travel in that it denies to nonresidents medical services that are available in New Jersey.  [Pls.' Opp'n at 6–8 (citing *Saenz v. Roe*, 526 U.S. 489 (1999)).]  Before addressing the parties' arguments, the Court considers the purpose and scope of the Privileges and Immunities Clause.

*a.    What does the Privileges and Immunities Clause Protect?*

Under the Privileges and Immunities Clause, "[t]he Citizens of each State [are] entitled to all Privileges and Immunities of Citizens in the several States."  U.S. CONST. art. IV, § 2, cl. 1.  This Clause was intended to " 'strongly . . . constitute the citizens of the United States [as] one people,' by 'plac[ing] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.' "  *Lunding v. N.Y. Tax Appeals Trib.*, 522 U.S. 287, 296 (1998) (second alteration in original) (quoting *Paul v. Virginia*, 8

18

Wall. 168, 180 (1868)).  But the scope of the Clause's protection has not always been well defined.[7]  As Justice Thurgood Marshall put it, the Clause established a "norm of comity without specifying the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment." *Austin v. New Hampshire*, 420 U.S. 656, 660 (1975).[8]

At one time, the Clause was believed to protect the "natural rights" enjoyed by all citizens of the United States as a result of their membership in a free, democratic society, regardless of the rights afforded by a state to its own citizens.  This was the view famously expressed by Justice Bushrod Washington in *Corfield v. Coryell*, 6 F.Cas. 546 (No. 3,230) (C.C.E.D. Pa. 1823)—the "first, and long the leading, explication of the Clause," *Austin*, 420 U.S. at 661.  Riding circuit in *Corfield*, Justice Washington stated that the Clause protected "fundamental rights," including:

> The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state[.]

---

[7] *See Lee v. Miner*, 458 F.3d 194, 198 (3d Cir. 2006) (recognizing the "limited guidance" of the "relative paucity of judicial pronouncements regarding the reach of the Privileges and Immunities Clause" and offering distillation of "basic principles"), *abrogated by McBurney v. Young*, 569 U.S. 221 (2013).

[8] For discussion of the historical influences of the pre-constitutional period and the connection between the Privileges and Immunities Clause of the Constitution and Article IV of the Articles of Confederation, see *Austin*, 420 U.S. at 660–61.  See also *Supreme Ct. of N.H. v. Piper*, 470 U.S. 274, 279–80 (1985); *United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of Camden*, 465 U.S. 208, 224–27 (1984) (Blackmun, J., dissenting).

*Corfield*, 6 F.Cas. at 552.[9]  Though this language continues to be quoted with approval, *see, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 501 & n.14 (1999), "[t]he 'natural rights' theory that underlay *Corfield* was discarded long ago." *Supreme Ct. of N.H. v. Piper*, 470 U.S. 274, 281 n.10 (1985) (citing *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 511 (1939)). In *Hague*, Justice Owen Roberts summarized what he perceived to be the now "settled view":  the Clause does not provide that "a citizen of one state carries with him into another fundamental privileges and immunities which come to him necessarily by the mere fact of his citizenship in the state first mentioned."  307 U.S. at 511.  Rather, it provides that "in any state every citizen of any other state is to have the same privileges and immunities which the citizens of that state enjoy."  *Id.*  In other words, the Clause simply "prevents a state from discriminating against citizens of other states in favor of

---

[9] His statement is preceded by the following, also frequently cited, language:

> The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, *fundamental*; *which belong, of right, to the citizens of all free governments*; *and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign*. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole.

*Corfield*, 6 F.Cas. at 551–52 (emphases added).  This is the statement that the Supreme Court in *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 384 n.20 (1978), believed to be the reason Justice Owen Roberts in *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 511 (1939), ascribed the "natural rights" theory to Justice Washington.

its own." *Id.*; *accord Paul*, 8 Wall. at 180–81.    Writing a decade later, the Court reinforced this view, explaining that the Clause was intended to "fuse into one Nation a collection of independent, sovereign States" and "insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948).

Yet two threads remained:  the continuing vitality of Justice Washington's exposition in *Corfield* as to the Clause's scope and the more straightforward proscription against discrimination based on residence embraced in modern cases.  In *Baldwin v. Fish & Game Commission of Montana*, 436 U.S. 371 (1978), the Supreme Court synthesized these two seemingly disparate views.  There, the Court considered a Montana law that charged nonresidents a license fee 25 times greater than that charged to residents to hunt elk recreationally.  *Id.* at 373.  Recognizing that some distinctions based on residence are not constitutionally suspect, the Court identified two examples—states may restrict to their citizens the right to vote and the right to hold state elective office.  *See id.* at 383.  "No one would suggest" otherwise.  *Id.*  A state need not "always apply its laws or all its services equally to anyone, resident or nonresident, who may request it so to do."  *Id.* (citations omitted).  The Court continued:

> Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those "privileges" and "immunities" bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally.

21

*Id.* Applying these principles, the Court preserved the Montana law. *Id.* at 388. The asserted interest "in sharing [the] limited resource [of elk] on more equal terms with Montana residents simply does not fall within the purview of the Privileges and Immunities Clause," the Court explained. *Id.* "Equality in access to Montana elk is not basic to the maintenance or well-being of the Union." *Id.* This is the rule to which the Court continues to adhere: "the Privileges and Immunities Clause protects only those privileges and immunities that are 'fundamental.' " *McBurney v. Young*, 569 U.S. 221, 226 (2013) (citing *Baldwin*, 436 U.S. at 382, 388).[10]

Accordingly, when evaluating a state law that is alleged to unjustifiably discriminate against nonresidents, courts must engage in a two-step inquiry. *Supreme*

---

[10] But not all members of the *Baldwin* Court would have synthesized *Corfield*, *Paul*, *Hague*, *Austin*, and the more modern Privileges-and-Immunities-Clause cases in this way. Writing in dissent, Justice William Brennan believed that Justice Washington's "expansive interpretation" of the Clause as "broadly insuring a host of rights against *all* government interference" was erroneously "superimposed" on the modern cases that conceived of the Clause as prohibiting a State from discriminating against nonresidents without justification. *Baldwin*, 436 U.S. at 397 (Brennan, J., dissenting). Believing *Corfield* to be a relic of a "bygone era," *id.* at 399, he stated:

> I think the time has come to confirm explicitly that which has been implicit in our modern privileges and immunities decisions, namely that an inquiry into whether a given right is 'fundamental' has no place in our analysis of whether a State's discrimination against nonresidents—who 'are not represented in the [discriminating] State's legislative halls'— violates the Clause. Rather, our primary concern is the State's justification for its discrimination.

*Id.* at 402 (alteration in original) (internal citation omitted). Justice Brennan would have permitted every instance of state-sponsored discrimination against nonresidents to be subjected to a form of intermediate scrutiny. *See id.* That the Court did not adopt his formulation is significant here, as explained below.

*Ct. of Va. v. Friedman*, 487 U.S. 59, 64 (1988).  As a threshold matter, courts first consider whether the nonresident's interest is "sufficiently 'fundamental' to the promotion of interstate harmony so as to 'fall within the purview of the Privileges and Immunities Clause.' " *United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of Camden*, 465 U.S. 208, 218 (1984) (hereinafter, "*Camden*") (quoting *Baldwin*, 436 U.S. at 388).  When the state discrimination affects a fundamental privilege, courts then consider whether (i) "there is a substantial reason for the difference in treatment" and (ii) "the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Piper*, 470 U.S. at 284 (citing *Camden*, 465 U.S. at 222).  "In deciding whether the discrimination bears a close or substantial relationship to the State's objective, the Court has considered the availability of less restrictive means." *Id.*

Protecting against discrimination affecting fundamental privileges, the Supreme Court has stricken state laws that unreasonably burdened nonresidents' right to "ply their trade, practice their occupation, or pursue a common calling." *See, e.g.*, *Piper*, 470 U.S. 274 (striking New Hampshire Supreme Court rule limiting bar admission to state residents); *Hicklin v. Orbeck*, 437 U.S. 518 (1978) (invalidating Alaska statute containing a resident hiring preference for all employment related to state's oil and gas resources); *Austin v. New Hampshire*, 420 U.S. 656 (1975) (striking New Hampshire law subjecting nonresidents to tax on income derived in state); *Toomer*, 334 U.S. 385 (invalidating law requiring nonresidents to pay a license fee 100 times greater than that

23

charged to residents to shrimp commercially in South Carolina); *Ward v. Maryland*, 12 Wall. 418 (1871) (striking law requiring nonresidents to pay $300 fee to trade in goods not manufactured in Maryland while resident traders paid a fee varying from $12 to $150).[11]  The Court has also invalidated laws burdening nonresidents' ability to own and dispose of private property within the state, *Blake v. McClung*, 172 U.S. 239 (1898), and to access the courts of the state, *Canadian N. Ry. Co. v. Eggen*, 252 U.S. 553 (1920).

But it must be recognized that some state laws distinguishing between residents and nonresidents will not come within the scope of the Clause altogether.  *See, e.g.*, *McBurney*, 569 U.S. at 233–34; *Baldwin*, 436 U.S. at 388.  After all, "without certain residence requirements the State 'would cease to be the separate political communit[y] that history and the constitutional text make plain w[as] contemplated.' "  *Piper*, 470 U.S. at 282 n.13 (alterations in original) (quoting Gary J. Simson, *Discrimination Against Nonresidents and the Privileges and Immunities Clause of Article IV*, 128 U. Pa. L. Rev. 379, 387 (1979)).

With the general contours of the Clause's protections illustrated, the Court now turns to the parties' arguments specifically.

> **b.    Does the Act's Residence Requirement Burden a Fundamental Privilege?**

Defendants contend that the Act's residence requirement does not burden a fundamental privilege protected by the Privileges and Immunities Clause because there

---

[11] As the numerous citations suggest, this privilege—the "pursuit of a common calling"—is the subject of "[m]any, if not most," of the Court's cases addressing the Privileges and Immunities Clause.  *Camden*, 465 U.S. at 219.

is no fundamental right to medical aid in dying. [Defs.' Br. at 13.] They submit that this case is controlled by *McBurney v. Young*, 569 U.S. 221 (2013), and *Washington v. Glucksberg*, 521 U.S. 702 (1997). [*Id.* at 14.] In opposition, Plaintiffs contend that the Act's residence requirement burdens the fundamental right of interstate travel insofar as the requirement unjustifiably denies to nonresidents a medical service that is otherwise available to New Jerseyans. [Pls.' Opp'n at 6–8 (discussing *Saenz v. Roe*, 526 U.S. 489 (1999)).] The Court considers *McBurney* and *Glucksberg* before turning to *Saenz* and Plaintiffs' submission.

In *McBurney*, the Supreme Court considered a Privileges-and-Immunities-Clause challenge to Virginia's Freedom of Information Act (FOIA), which restricted to Virginians the ability to inspect and copy public records. 569 U.S. at 224. The nonresident challengers asserted that Virginia's FOIA regime violated four of their "fundamental" privileges: their ability to pursue a common calling, own and transfer property, access Virginia's courts, and access public information. *Id.* at 226–27. The Court concluded that Virginia's FOIA did not abridge the first three of these asserted privileges, *see id.* at 227–32, and it rejected the challengers' claim that access to public information was a fundamental right protected by the Clause, *id.* at 232. Examining history and tradition, the Court explained that "there is no constitutional right to obtain all the information provided by FOIA laws." *Id.* (citations omitted). Because "[n]o such right was recognized at common law," "[i]t certainly cannot be said that such a broad right has 'at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and

25

sovereign.' " *Id.* at 233 (quoting *Corfield*, 6 F.Cas. at 551).  Said differently, since "FOIA laws are of relatively recent vintage" (the first being enacted in 1966), "[t]here is no contention that the Nation's unity foundered in their absence, or that it is suffering now because of the citizens-only FOIA provisions that several States have enacted." *Id.* at 234.  FOIA rights are not " 'basic to the maintenance or well-being of the Union,' " *id.* (quoting *Baldwin*, 436 U.S. at 388), so the residence restriction reflected in Virginia's FOIA regime did not violate a privilege or immunity protected by the Clause, *id.* at 224, 227, 232.

Now consider *Glucksberg*.  There, the Supreme Court considered whether a Washington law prohibiting "physician-assisted suicide" unduly burdened an individual's fundamental rights as protected by the substantive component of the Due Process Clause.  521 U.S. at 720–22.  A group of terminally ill patients asserted a liberty interest to "choose how to die," or "determine[e] the time and manner of one's death," which they argued to follow from *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), and *Cruzan v. Director, Montana Department of Health*, 497 U.S. 261 (1990).  *Glucksberg*, 521 U.S. at 722–24.  The Court rejected the plaintiffs' framing, construing their asserted liberty interest as the right to commit suicide with the assistance of another.  *Id.* at 723.  Having surveyed the common-law history and tradition, *see id.* at 710–16,[12] the Court recognized a consistent pattern of

---

[12] For example, the Court observed that, at the time of its decision, almost every State in the country—and almost every western democracy—had a criminal ban on

condemning and prohibiting assisted suicide, "even for terminally ill, mentally competent adults," *id.* at 723. And after distinguishing *Casey* and *Cruzan*, *see id.* at 724–27,[13] the Court held that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause," *id.* at 728. It then considered whether Washington's assisted-suicide ban was rationally related to a legitimate government interest, *id.* at 728–34,[14] holding that it unquestionably was, *id.* at 735. Importantly, in determining that physician-assisted suicide (i.e., medical aid in dying) was not a fundamental right, the Court allowed the "earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide . . . to continue, as it should in a democratic society." *Id.* at 735; *see also id.* at 718–19

---

assisted suicide. *Glucksberg*, 521 U.S. at 710 & n.8 (collecting sources). Likewise, "for over 700 years," the Court explained, "the Anglo-American common-law tradition has punished or otherwise disapproved of both suicide and assisting suicide." *Id.* at 711 & n.11. Citing Sir William Blackstone, the Court noted that " 'the law has . . . ranked [suicide] among the highest crimes.' " *Id.* at 712 (alteration in original) (quoting 4 W. BLACKSTONE, COMMENTARIES *189). And "[b]y the time the Fourteenth Amendment was ratified, it was a crime in most States to assist a suicide." *Id.* at 715 (citing *Cruzan*, 497 U.S. at 294–95).

[13] The Court emphasized, for instance, that the fact "many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected." *Glucksberg*, 521 U.S. at 727–28 (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33–35 (1973)).

[14] It considered several governmental interests, including (1) protecting and preserving life, (2) preventing suicide, (3) protecting the integrity and ethics of the medical profession, (4) protecting vulnerable groups from abuse, neglect, and mistakes, and (5) avoiding movement towards voluntary or involuntary euthanasia. *Glucksberg*, 521 U.S. at 728–34; *see also id.* at 728 n.20.

(discussing the States' "serious, thoughtful examinations of physician-assisted suicide and similar issues" in recent years).

Here, *McBurney* and *Glucksberg* are dispositive. Govatos, Sealy, and similarly situated patients with serious or terminal illnesses do not possess a fundamental right to receive "medical aid in dying." *See Glucksberg*, 521 U.S. at 728; *see also Kligler v. Att'y Gen.*, 198 N.E.3d 1229, 1258, 1259 (Mass. 2022) (recognizing that no state supreme court "has concluded that physician-assisted suicide constitutes a fundamental right" as a matter of state constitutional law). As the Supreme Court explained, there is a long history in the Anglo-American tradition of criminalizing the assistance of suicide. *See Glucksberg*, 521 U.S. at 710–16 (discussing primary and secondary sources). Only until recently, it was a crime in almost every state to assist a suicide, no matter the circumstances. *Id.* at 710 & n.8. But in 1994, Oregon voters authorized this Nation's first medical-aid-in-dying law for terminally ill adults. *Id.* at 717 & n.14 (citing OR. REV. STAT. § 127.800, *et seq.* (1996)). Following the enactment of Oregon's "Death with Dignity Act," a nationwide debate ensued about the merits and demerits of medical aid in dying. *See id.* at 717–18. Some states reacted by enacting physician-assisted suicide bans. *See id.* at 718 (first citing IOWA CODE ANN. §§ 707A.2, 707A.3 (1997); then citing R.I. GEN. LAWS §§ 11-60-1, 11-60-3 (1996)). In other states, legislation was proposed, considered, and rejected—at least initially. *See id.* at 717 & n.15 (collecting sources). Today, after years of deliberation and the steady efforts of advocacy organizations, medical-aid-in-dying laws have taken effect in 10 states,

including New Jersey, and the District of Columbia. *See Kligler*, 198 N.E.3d at 1237 n.5 (collecting sources); *see also supra* note 3. Delaware and Pennsylvania—the states of residence of Govatos and Sealy, respectively—are not among these jurisdictions. In these states, assisting a suicide remains criminal. *See* DEL. CODE ANN. tit. 11, §§ 632(5), 645 (criminalizing the assistance of another to commit suicide); 18 PA. CONS. STAT. § 2505(b) (similar); *see also supra* Section I.B (illustrating statutory provisions). This state of affairs—where the voters and legislators in each state decide for themselves whether to approve medical aid in dying—is exactly the result embraced by the Court in *Glucksberg*. *See* 521 U.S. at 735. The issue has been firmly committed to the democratic process.

The Supreme Court's disposition of *Glucksberg* informs whether Plaintiffs' challenge is cognizable under the Privileges and Immunities Clause. By enabling each political community within our federal system to determine whether to authorize or prohibit medical aid in dying, and under what terms and conditions, *see id.*, the *Glucksberg* Court confirmed, in principle, that access to end-of-life medication is not " 'basic to the maintenance or well-being of the Union.' " *McBurney*, 569 U.S. at 234 (quoting *Baldwin*, 436 U.S. at 388). Because medical-aid-in-dying laws are "of relatively recent vintage," "[i]t certainly cannot be said that such a broad right [to medical aid in dying] has 'at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign.' " *Id.* at 233 (quoting *Corfield*, 6 F.Cas. at 551).

29

Accordingly, just as the Privileges and Immunities Clause did not cover the nonresidents' asserted right to access public information in *McBurney*, here Govatos and Sealy (and other nonresident patients with terminal illnesses) cannot assert a privilege under the Clause to receive medical aid in dying under the same terms and conditions as citizens of New Jersey. Access to medical aid in dying is not a fundamental right, and this Court is bound by the scope articulated in *Baldwin* and reaffirmed in later cases, such as *McBurney*. To hold otherwise, this Court would have to apply the scope endorsed by Justice Brennan—that "an inquiry into whether a given right is 'fundamental' has no place" in a Privileges-and-Immunities-Clause challenge and that a court should subject any instance of state discrimination against nonresidents to intermediate scrutiny. *See Baldwin*, 436 U.S. at 402 (Brennan, J., dissenting). That it cannot do. The Act's residence restriction "merely reflect[s] the fact that this is a Nation composed of individual States," *id.* at 383, where a debate continues "about the morality, legality, and practicality of [medical aid in dying]," *Glucksberg*, 521 U.S. at 735.

Plaintiffs argue, however, that this conclusion "misses the forest for the trees." [Pls.' Opp'n at 9.] They submit that the residence requirement does not implicate an asserted right to medical aid in dying; rather, it burdens their fundamental right to interstate travel. [*See id.* at 6–13.] In other words, because the State of New Jersey has authorized medical aid in dying for its residents, it must treat nonresidents as "welcome visitor[s]" and extend the privilege accordingly. The Court must reject

30

Plaintiffs' effort to bootstrap a non-fundamental privilege—i.e., access to medical aid in dying—to a fundamental right—i.e., interstate travel.

It is true that the Privileges and Immunities Clause protects the right of interstate travel. The right has been described as "fundamental" and "firmly established and repeatedly recognized," even though it is nowhere mentioned in the text of the United States Constitution. *United States v. Guest*, 383 U.S. 745, 757 (1966); *see also Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) ("[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement."), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974). It is also true that this "right to travel" has at least three component parts: (1) "the right of a citizen of one State to enter and to leave another State"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999).

At issue in *Saenz*, for instance, was a California statute implicating the third aspect of the right to travel. *Id.* at 502. The statute limited the maximum welfare benefits available to newly arrived residents during their first 12 months in the state by paying them the amount to which they would have been entitled in their prior state of residence. *Id.* at 492. The lower courts had determined that the apparent purpose of the statute was "to deter migration of poor people to California," *id.* at 506 n.19 (citing

*Roe v. Anderson*, 134 F.3d 1400, 1404 (9th Cir. 1998)), as the state offered especially generous welfare benefits.  Ultimately, the *Saenz* Court concluded that the state's legitimate fiscal interests provided no justification for its discriminatory distinctions between "equally eligible residents."  *Id.* at 506–07.

Indeed, there is an entire line of cases addressing this "right to be treated like other citizens of th[e] State."  Distinguishing between permissible, bona fide residence requirements and unnecessarily burdensome waiting-periods, the Supreme Court has invalidated state laws imposing one-year durational residence requirements as a condition to obtain welfare benefits, *Shapiro*, 394 U.S. at 629, to register to vote, *Dunn v. Blumstein*, 405 U.S. 330, 359–60 (1972), and to receive nonemergency free medical care, *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 269 (1974).[15]  The Court's principal concern in these cases was the penalty exacted on newly arrived residents.  *See, e.g.*, *Dunn*, 405 U.S. at 342 ("In the present case, such [durational residence] laws force a person who wishes to travel and change residences to choose between travel and the basic right to vote.  Absent a compelling state interest, a State may not burden the right to travel in this way." (internal citation omitted)).  However, the Court declined to strike, for example, a state statute requiring a one-year residence as a

---

[15] In these cases, the Court has noted that, in principle, there is nothing constitutionally suspect about a bona fide residence requirement.  *See, e.g.*, *Dunn*, 405 U.S. at 342 n.13 (decision to invalidate one-year waiting period to vote should not be read to "cast doubt on the validity of appropriately defined and uniformly applied bona fide residence requirements"); *Shapiro*, 394 U.S. at 636 (observing that "[t]he residence requirement and the one-year waiting-period requirement [were] distinct and independent prerequisites for assistance").

condition to pay a lower, in-state rate of tuition at state colleges and universities. *See Vlandis v. Kline*, 412 U.S. 441, 452–53 & n.9 (1973). There is a tension in these durational-residence cases between laws that implicate a "basic necessity of life," such as welfare assistance and medical care, and those implicating "less essential" benefits, such as laws requiring some students to pay out-of-state tuition rates. *See Memorial Hosp.*, 415 U.S. at 259 & n.15. "[G]overnmental privileges or benefits necessary to basic sustenance have often been viewed as being of greater constitutional significance than less essential forms of governmental entitlements." *Id.* at 259 (citations omitted).

Of course, Plaintiffs' only claim here is that the Act's *non*-durational residence requirement implicates the second component of the right to travel: "the right to be treated as a welcome visitor." Govatos and Sealy seek the ability to receive from New Jersey physicians a prescription for end-of-life medication to self-administer outside of the State. While it is true that the Privileges and Immunities Clause protects the multi-faceted right to travel, it is not true that "the right to be treated as a welcome visitor" can sweep within its ambit any state privilege, including one that is not otherwise protected by the Clause. The *Saenz* Court made clear that the basis for the second component of the right to travel is the text of the Clause itself. 526 U.S. at 501–02. Explaining that a sojourner " 'is entitled to enjoy the Privileges and Immunities of Citizens in the several States' that he visits," *id.* at 501, the *Saenz* Court specified that a welcome-visitor claim is one and the same as a Privileges-and-Immunities-Clause claim. *See id.* at 501–02; *see also Peterson v. Martinez*, 707 F.3d 1197, 1213 (10th Cir. 2013) (welcome-visitor claims are "coterminous" with privileges-and-immunities

33

claims). Accordingly, the privilege of which a visitor seeks to avail herself must itself be "fundamental." *See Baldwin*, 436 U.S. at 383 ("Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally."). This makes sense because "travel—movement from one State to another—is at the core of every Privileges and Immunities Clause challenge." *Bach v. Pataki*, 408 F.3d 75, 87 (2d Cir. 2005). In the end, Plaintiffs cannot reframe their challenge to the Act as a "welcome-visitor claim" to sidestep *Baldwin*, *McBurney*, and *Glucksberg*, and avoid the conclusion that access to medical aid in dying is *not* a fundamental privilege protected by the Clause.

Resisting that conclusion further, Plaintiffs rely on *Doe v. Bolton*, 410 U.S. 179 (1973), to advance their position that the Act denies visitors the privilege of procuring the general medical care that is available in New Jersey. [Pls.' Opp'n at 7–8.] But merely to state their argument is to explain why *Doe* is distinguishable. On the same day that the Supreme Court struck down a Texas criminal abortion statute in *Roe v. Wade*, 410 U.S. 113 (1973), the *Doe* Court considered and struck down various components of Georgia's abortion law. One component of the law limited abortion access to residents of the state. *Doe*, 410 U.S. at 183–84. The challengers asserted that the residence requirement violated the right to travel, as articulated in *Shapiro*, 394 U.S. at 629–31, and the Court agreed, concluding that there was no articulated policy justification for the requirement. *Doe*, 410 U.S. at 200. It also explained that:

> Just as the Privileges and Immunities Clause protects persons who enter other States to ply their trade, so must it protect persons who enter Georgia seeking the medical services that are available there. A contrary holding would mean that a State could limit to its own residents the general medical care available within its borders. That we could not approve.

*Id.* (internal citations omitted), *abrogated in part on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). This holding "did not depend on the constitutionally protected status of abortion," *Yellowhammer Fund v. Att'y Gen. of Ala.*, -- F. Supp. 3d --, --, 2024 WL 1999546, at *12 n.11 (M.D. Ala. May 6, 2024), and it is apparent from the discussion—albeit brief—that Georgia had no basis for the residence requirement it imposed in the abortion context, *see Doe*, 410 U.S. at 200 (suggesting that its conclusion might have been different had the statute been based upon a more limited policy of "preserving state-supported facilities for Georgia residents," for example); *accord Salla v. Monroe Cnty.*, 399 N.E.2d 909, 916–17 (N.Y. 1979) (Gabrielli, J., dissenting).

Here, the Court agrees that the State cannot exclude nonresidents from accessing the "general medical care available" in New Jersey, but it does not agree that medical aid in dying refers to such "general medical care." First, medical aid in dying—legally indistinguishable from the criminal act of assisted suicide, but for the statute—"involves a physician actively prescribing lethal drugs for the purpose of directly causing the patient's death." *Myers v. Schneiderman*, 85 N.E.3d 57, 63 (N.Y. 2017). "[N]o medical professional society in the United States has adopted an official stance in favor of physician-assisted suicide." *Kligler*, 198 N.E.3d at 1255 (citation

35

omitted); *see also Glucksberg*, 521 U.S. at 731.  This demonstrates that medical aid in dying is not "general medical care" like, for example, primary care, urgent care, psychiatric care, dentistry, rehabilitation, or other forms of ordinary healthcare for which patients often travel interstate.  *Glucksberg* confirms that medical aid in dying is not that simple.[16]

Second, key facts alleged here are different from those presented in *Doe*.  The challenged law in that case permitted abortions to be performed only under narrow circumstances within the State of Georgia.  *See Doe*, 410 U.S. at 184.  By contrast, medical aid in dying involves self-administration of end-of-life medication wherever the patient is located.  *See, e.g.*, N.J. STAT. ANN. § 26:16-3 (definition of "self-administer").  Govatos and Sealy seek to self-administer such medication in their home states—Delaware and Pennsylvania, [*see, e.g.*, Compl. ¶¶ 30, 35]—where medical aid in dying is legally indistinguishable from assisted suicide, a criminal act.  The physician-Plaintiffs suggest the same thing as to their nonresident, terminally ill patients.  [*See, e.g.*, *id.* ¶¶ 44, 55–58.]  Unlike in *Doe* where Georgia prohibited nonresidents from visiting the state to have an abortion performed there, 410 U.S. at 184, 200, New Jersey prevents nonresidents from receiving an end-of-life prescription in the State to self-administer *elsewhere*.  And, in contrast with *Doe*, where Georgia had no apparent basis for its residence requirement, *see id.* at 200, New Jersey legitimate

---

[16] Because courts have concluded that medical aid in dying is altogether different from other forms of healthcare, this Court is not persuaded that there is a material factual dispute as to "what constitutes 'general medical care.' "  [Pls.' Opp'n at 11.]

reasons to require patients to be residents of the State to be eligible to receive a prescription for end-of-life medication. The State's ability to protect providers from out-of-state liability, to ensure that self-administration is entirely voluntary, and otherwise to accomplish the purposes of the Act, see N.J. STAT. ANN. § 26:16-2(c), is indisputably more limited outside New Jersey. *See also infra* Section IV.B.3. *Doe* is thus distinguishable. A nonresident's right to procure general medical services within the State does not include medical aid in dying.[17]

---

[17] That the Act refers to "New Jersey's long-standing commitment to individual dignity, informed consent, and the ***fundamental right*** of competent adults to make ***health care decisions*** about whether to have life-prolonging medical or surgical means or procedures provided, withheld, or withdrawn" is not to the contrary of the conclusion that medical aid in dying is not "general medical care." N.J. STAT. ANN. § 26:16-2(a) (emphases added). First, the right recognized by the State refers to the constitutionally protected right of a competent individual to refuse unwanted medical treatment, which is anchored in the common-law doctrine of informed consent, *see Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 277–79 (1990), not a ***fundamental*** right to "obtain medication that the patient may choose to self-administer in order to bring about the patient's humane and dignified death," N.J. STAT. ANN. § 26:16-2(a). That related "right" to medical aid in dying is qualified and derived entirely from statutory authorization, not constitutional protection. Second, the Court does not read § 26:16-2 as a declaration that medical aid in dying is "general medical care." Rather, the legislation, considered as a whole, reads as a highly reticulated scheme to exempt actions taken consistent with the Act as *not* assisted suicide, which remains criminal. *See id.* § 2C:11-6. And, in any case, the gloss of legislative findings cannot prescribe this Court's analysis of what the Constitution requires. *Cf. City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) (explaining that § 5 of the Fourteenth Amendment enables Congress to enforce the provisions thereof, not "to determine what constitutes a constitutional violation" because "Congress does not enforce a constitutional right by changing what the right is"). "The judicial authority to determine the constitutionality of laws, in cases and controversies, is based on the premise that the 'powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.' " *Id.* at 516 (quoting *Marbury v. Madison*, 1 Cranch 137, 176 (1803)).

Finally, in so concluding, the Court is not persuaded by Plaintiffs' suggestion that Defendants are talking out of both sides of their mouths. [*See* Pls.' Opp'n at 8, 11.] Plaintiffs press that, here, New Jersey has contradicted its position in *Fund Texas Choice v. Paxton*, Case No. 1:22-cv-859-RP (W.D. Tex. filed Aug. 23, 2022), where it jointly filed an amicus brief with several other states. There, the Amici States argued that Texas' abortion laws "deter individuals from [leaving Texas and] crossing state lines to obtain an abortion, provide an abortion, or support a pregnant person seeking an abortion" and "implicate the rights of Texas residents under the Privileges and Immunities Clause to seek access as welcome visitors to the same abortions available to [New Jersey's] residents." Br. for the States of California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Washington, and the District of Columbia as *Amici Curiae* Supporting Pls.' Mot. for Prelim. Inj. at 5, *Fund Texas Choice v. Paxton*, Case No. 1:22-cv-859-RP (W.D. Tex. Sept. 26, 2022), ECF No. 48. They further claimed that "any effort by Texas to dictate what kind of healthcare a 'welcome visitor' may access within Amici States' borders implicates the values underlying the Privileges and Immunities Clause." *Id.* at 7.

But New Jersey's position here does not contradict its position in the *Fund Texas Choice* litigation. There, the Amici States sought to protect access to abortion within *their own* borders, as the "Amici States ha[d] made clear that residents and visitors alike can access abortion services when in [their] jurisdictions." *Id.* Texas' laws aimed to

38

prevent its residents from accessing abortion in *other* states where it remains legal, and as the Amici States explained in their brief, that extraterritorial effort could adversely affect, among others, *their own* citizens' ability to return to their home states in the event they sought access to abortion. *Id.* at 1–2. This is exactly the issue that Justice Kavanaugh described as "not especially difficult as a constitutional matter" because "the constitutional right to interstate travel" would prevent a state's effort to "bar a resident of that State from traveling to another State to obtain an abortion." *Dobbs*, 597 U.S. at 346 (Kavanaugh, J., concurring). Courts have already passed judgment on similar state efforts. *See, e.g.*, *Yellowhammer Fund*, -- F. Supp. 3d. --, --, 2024 WL 1999546, at *13 (explaining that threats of Alabama Attorney General to prosecute residents who travel out-of-state to receive a lawful abortion would be violative of right to travel).

Here, by contrast, New Jersey limits access to medical aid in dying to New Jersey residents, a service that is criminal in most other jurisdictions. The State does not attempt any extraterritorial application of its laws. New Jersey may permissibly oppose Texas' effort to penalize its residents' right to travel to sister states to engage in activity that is lawful in those states, *see Dobbs*, 597 U.S. at 346 (Kavanaugh, J., concurring), while maintaining here that nothing in the Constitution requires it to extend medical aid in dying to other states' residents. The issues are distinct, and the Court perceives no conflict between the State's litigation positions.

Having concluded that access to medical aid in dying is not a privilege within the scope of the Clause's protections, *see McBurney*, 569 U.S. at 234; *Baldwin*, 436 U.S.

at 383, 388, that access to medical aid in dying is not encompassed within the right to interstate travel, *see Saenz*, 526 U.S. at 501–02; *see also Peterson*, 707 F.3d at 1213; *Bach*, 408 F.3d at 87, and that the right to procure available medical care, *see Doe*, 410 U.S. at 200, does not include medical aid in dying, the Court does not further scrutinize the Act's residence requirement under the Privileges and Immunities Clause, *see Friedman*, 487 U.S. at 64 (explaining that courts must consider whether challenged restriction is closely related to a substantial state interest *if* the challenged restriction deprives nonresidents of a protected privilege (citing *Piper*, 470 U.S. at 284)); *see also, e.g.*, *McBurney*, 569 U.S. at 234 (concluding inquiry after determining that right to access and copy public records was not "fundamental"); *Baldwin*, 436 U.S. at 388 (similar).[18] Therefore, the Court will dismiss Count I of the Complaint.

## 2.     Count II:  Dormant Commerce Clause.

Plaintiffs also assert that the Act's residence requirement violates the dormant Commerce Clause because it "discriminates against interstate commerce on its face" by preventing New Jersey physicians from treating out-of-state patients and interfering with nonresidents' "ability to access New Jersey medical care."  [Compl. ¶ 78; *see also id.* ¶¶ 73–81.]  Taking their factual allegations as true, the Court determines that their claim under the dormant Commerce Clause is not cognizable.

---

[18] *But see infra* Section IV.B.3 (addressing whether residence requirement satisfies rational-basis review).

Under the Constitution, Congress is vested with the power "to regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. This 'positive' grant of authority has long been interpreted to impose certain 'implicit' limitations on state power "to interfere with or impose burdens on interstate commerce." *Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 652 (1981).[19] This limitation-by-inference is known as the "dormant" or "negative" Commerce Clause, and it is chiefly concerned with policing against economic protectionism—"that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (explaining that this aim "lies at the 'very core' of our dormant Commerce Clause jurisprudence" (citing *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997))). "Rooting out this state-based discrimination has always been the goal." *N.J. Staffing Alliance v. Fais*, 2023 WL 4760464, at *9 (D.N.J. July 26, 2023), *aff'd* 110 F.4th 201 (3d Cir. 2024).

When a law implicates the dormant Commerce Clause, courts assess its validity under one of two tests. *See Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669

---

[19] *But see Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 516 (2019) (recognizing that "[i]n recent years, some Members of the Court have authored vigorous and thoughtful critiques of this interpretation"); *see also, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 610 (1997) (Thomas, J., dissenting) (claiming that the "negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application").

F.3d 359, 372 (3d Cir. 2012); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 427 (3d Cir. 2011); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 151 F. Supp. 2d 526, 537 (D.N.J. 2001). First, if the law directly discriminates against interstate commerce in either purpose or effect, it must survive heightened scrutiny. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). "[S]uch protectionism is *per se invalid*, save in a narrow class of cases in which the State can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Tri-M Grp.*, 638 F.3d at 427 (cleaned up); *see also Heffner v. Murphy*, 745 F.3d 56, 70 (3d Cir. 2014) (rephrasing standard). The State bears the burden of proof in such cases, and laws subject to this rule are generally struck down. *Mech. Contractors Ass'n of N.J., Inc. v. New Jersey*, 541 F. Supp. 3d 477, 494 (D.N.J. 2021).

But if a statute has only "indirect effects on interstate commerce" and regulates "evenhandedly," courts are directed to examine "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).[20] For *Pike* balancing

---

[20] As *National Pork Producers Council* illustrates, there is less agreement about the continued viability of *Pike* balancing. *Compare* 598 U.S. at 377–90 (plurality op.) (criticizing doctrine as authorizing courts to employ "a roving license" to second-guess legislative policy judgments), *with, e.g., id.* at 394–403 (Roberts, C.J., concurring in part and dissenting in part) (acknowledging challenge of weighing "seemingly incommensurable values," but recognizing that courts are capable of balancing benefits and burdens). Because the Court concludes that the Act's residence requirement does not implicate the dormant Commerce Clause, it has no reason to consider further the limits of *Pike* balancing.

to apply, the State's action must be neutral on its face and in effect. *Tolchin v. Supreme Ct. of N.J.*, 111 F.3d 1099, 1107 (3d Cir. 1997); *see, e.g.*, *Mech. Contractors Ass'n*, 541 F. Supp. 3d at 495 (applying *Pike* balancing where licensing law treated contractors doing work in New Jersey the same, whether based within or without New Jersey).

Here, Defendants contend that the Act's residence requirement does not implicate the dormant Commerce Clause. [Defs.' Br. at 26–28.] This Court agrees. Based on the Complaint's allegations, [see Compl. ¶¶ 76–79], New Jersey's medical-aid-in-dying law does not discriminate against or burden interstate commerce. The "fundamental objective" of the dormant Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997); *see also New Energy Co.*, 486 U.S. at 273–74 (explaining that the Commerce Clause prohibits "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors"). Accordingly, the leading modern cases invoking the Clause "are properly read as invalidating statutes that promoted economic protectionism." *Nat'l Pork Producers Council*, 598 U.S. at 394 (Roberts, C.J., concurring in part and dissenting in part); *accord id.* at 369–70 (plurality op.). Here, far from an act of economic protectionism in an interconnected national marketplace, New Jersey's medical-aid-in-dying law does not confer an economic advantage on in-

43

State physicians by burdening out-of-state competitors;[21] rather, it merely permits residents of the State to access a service "that would not otherwise be available at all." *McBurney*, 569 U.S. at 235.  Unlike other forms of healthcare, there is no "interstate market" for medical aid in dying.  Medical aid in dying remains criminally prohibited in most jurisdictions.  *See Kligler*, 198 N.E.3d at 1237 & n.5; *Myers*, 85 N.E.3d at 65; *see also Cruzan*, 497 U.S at 280.  In New Jersey, the "private market" for medical aid in dying exists only because the State allows it to do so, *see Glucksberg*, 521 U.S. at 728, 735, and only for limited purposes, *see* N.J. STAT ANN. § 26:16-2(c).  Therefore, it makes little sense to scrutinize the Act's residence requirement under the dormant Commerce Clause as if there were a national market for medical aid in dying given that the Supreme Court in *Glucksberg* recognized that the issue is a unique matter of local concern and that states would reach different moral judgments on the question. *Cf. Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 559 (1st Cir. 2022) (Gelpí, J., dissenting) (arguing that, in the context of a challenge to Maine's cannabis licensing rule requiring all officers and directors of a dispensary to be residents of the state, the "Commerce Clause does not recognize an interest in

---

[21] Indeed, it would appear to accomplish the opposite result—burdening *intra*state commerce by limiting the "market" of patients available to New Jersey physicians who practice medical aid in dying.  That circumstance bears little resemblance to those cases in which the Court struck laws designed to benefit in-state producers at the expense of out-of-state competitors.  *See, e.g.*, *Healy v. Beer Inst.*, 491 U.S. 324 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986); *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. 511 (1935).

promoting a competitive market in illegal goods or services or forestalling hypothetical interstate rivalries in the same").[22]

Ultimately, a New Jersey physician cannot prescribe end-of-life medication to a terminally ill patient unless that person is, *inter alia*, a resident of the State. *See* N.J. STAT. ANN. § 26:16-6(a). Drs. Bryman and Pasik seek to prescribe end-of-life

---

[22] Plaintiffs claim that "legalizing a form of commerce does not free a state from the constraints of the dormant Commerce Clause." [Pls.' Opp'n at 23.] They cite *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), for that proposition. In *Variscite NY One*, the court considered a dormant Commerce Clause challenge to New York's cannabis licensing regime, which required dispensary applicants, *inter alia*, to have "a significant presence in New York State" by demonstrating that the applicant entity was mostly New-York-resident-owned. *Id.* at 240–41. Considering whether the challengers were entitled to an injunction, the court determined that the New York law discriminated against interstate commerce on its face, subjected the law to heightened scrutiny, and concluded that the challengers were likely to succeed because the state had not demonstrated that the law was sufficiently tailored to achieve its legitimate, designated goals. *Id.* at 240–42. The court observed that several other courts had applied heightened scrutiny to similar cannabis regulatory schemes. *Id.* at 240 (citing, for example, *NPG, LLC v. City of Portland*, 2020 WL 4741913 (D. Me. Aug. 14, 2020), and *Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985 (W.D. Mo. 2021)); *see also Ne. Patients Grp.*, 45 F.4th at 543–50, 554 (concluding, as the only federal court of appeals to have addressed the issue, that the dormant Commerce Clause applies to a state's licensing program for cannabis). But other courts have reached the opposite conclusion. *See, e.g.*, *Variscite NY Four, LLC v. N.Y. States Cannabis Control Bd.*, 2024 WL 406490, *12 (N.D.N.Y. Feb. 2, 2024); *Peridot Tree WA Inc. v. Wash. State Liquor & Cannabis Control Bd.*, 2024 WL 69733, at *9 (W.D. Wash. Jan. 5, 2024); *Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, 2023 WL 1798173, at *11 (W.D. Wash. Feb. 7, 2023). These cases illustrate that the market for cannabis is unique because federal law generally forbids its distribution, whereas many states now permit it. Just as some courts have questioned whether it makes sense to apply the dormant Commerce Clause to the hypothetical interstate market for cannabis, given its unique context, this Court cannot agree that the mere decision to legalize a criminal practice subjects a state to scrutiny under the Clause. Because of the unique and local character of medical aid in dying, it does not make sense to speak in terms of discrimination against "interstate commerce."

medication to out-of-state patients who otherwise qualify under the Act (*see id.* § 26:16-3), and Govatos and Sealy seek access to medical aid in dying without becoming residents of New Jersey.  Like *McBurney*, this case "quite literally poses the question whether [New Jersey] can deny out-of-state citizens a benefit that it has conferred on its own citizens," and it is "thus most properly brought under the Privileges and Immunities Clause," not the dormant Commerce Clause.  569 U.S. at 236.[23]  Because the Act's residence requirement does not directly or indirectly interfere with an interstate market for medical aid in dying, Plaintiffs' challenge is not actionable under the dormant Commerce Clause.[24]  *See id.* ("[T]his case is not governed by the dormant

---

[23] Plaintiffs contend that *McBurney* is distinguishable because, in that case, Virginia directly provided a service to its citizens—allowing them to obtain information from public officials—whereas here, New Jersey is not itself providing medical aid in dying, but regulating a "private market for such treatment."  [Pls.' Opp'n at 22–23.]  But that misses the point.  The question is whether New Jersey can limit to residents a service that would not otherwise exist but for its authorization.  Resolution of that question is governed by the Privileges and Immunities Clause, not the dormant Commerce Clause, because the latter requires interference "with the natural functioning of [an] interstate market" to come within the scope of the Clause's protection.  *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806 (1976).  For this reason, it is not enough to claim that the provision of healthcare services is "indisputably a commercial transaction," [Pls.' Opp'n at 22 (citing *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 935 (9th Cir. 2011)], or that "travel across state lines is itself interstate commerce," [*id.* (first citing *Camps Newfound*, 520 U.S. at 573; then citing *Edwards v. California*, 314 U.S. 160, 172 (1941)])].  There is daylight between the Privileges and Immunities Clause and the dormant Commerce Clause, even though there is a "mutually reinforcing relationship" between the clauses.  *Piper*, 470 U.S. at 280 n.8 (citation omitted).  Under Plaintiffs' approach, every claim under the Privileges and Immunities Clause would also set forth a viable claim under the dormant Commerce Clause.  The Court disagrees with that interpretation.

[24] In so holding, the Court has no cause to address whether the Act's residence requirement satisfies *Pike* balancing or the *per se* rule of invalidity, issues to which the

Commerce Clause.").    Accordingly, the Court will also dismiss Count II of the Complaint.

### 3.    Count III:  Equal Protection Clause.

Finally, Plaintiffs assert that the Act's residence requirement and definition of "qualified terminally ill patient" violate the Equal Protection Clause of the Fourteenth Amendment because they "invidiously discriminate against non-residents of New Jersey without a legitimate State interest."    [Compl. ¶ 85; *see also id.* ¶¶ 82–91.] Plaintiffs claim that, by distinguishing between residents and nonresidents, the Act unnecessarily burdens nonresidents' fundamental right to interstate travel and restricts their access to available medical services.    [*Id.* ¶¶ 86–89.]  As explained below, the Act's bona fide residence requirement neither targets a suspect class nor trammels a fundamental right, so it is subject to rational-basis review.    And the residence requirement is rationally related to legitimate governmental objectives.  Plaintiffs have not met their burden of alleging otherwise.

Under the Equal Protection Clause, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.  This principle "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Still, it "coexist[s] with the practical necessity that

---

parties devoted much of their submissions.  [*See* Defs.' Br. at 28–36; Pls.' Opp'n at 24–35].  If Plaintiffs' claim were viable, which it is not, it would not be appropriate under the circumstances alleged to apply either test at the pleading stage.

most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996) (first citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–72 (1979); then citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).  Accordingly, the Clause does not deny states the power to "treat different classes of persons in different ways"; rather, it prohibits states from employing classifications "on the basis of criteria wholly unrelated to the objective[s] of th[e] statute." *Eisenstadt v. Baird*, 405 U.S. 438, 446–47 (1972) (quoting *Reed v. Reed*, 404 U.S. 71, 75–76 (1971)).

When considering whether state legislation violates the Equal Protection Clause, the key threshold issue is the level of scrutiny to apply, *Tolchin v. Supreme Ct. of N.J.*, 111 F.3d 1099, 1113 (3d Cir. 1997), which depends on the nature of the classification at issue, *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  "If a classification neither burdens a fundamental right nor targets a suspect class, [a court] will uphold it so long as it bears a rational relation to some legitimate end." *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013) (cleaned up) (citation omitted); *see also Vacco v. Quill*, 521 U.S. 793, 799 (1997).  "However, where such legislation establishes 'a classification that trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, it must meet the strict scrutiny standard, under which a law must be narrowly tailored to further a compelling government interest." *Schumacher v. Nix*, 965 F.2d 1262, 1266 (3d Cir. 1992) (cleaned up) (internal citation omitted); *see also Cleburne*, 473 U.S. at 440–41.

48

Here, Plaintiffs do not argue that the Act's residence requirement targets a suspect class,[25] [*see* Pls.' Opp'n at 36–40], so heightened scrutiny will apply only if the residence requirement burdens a fundamental right. *See Connelly*, 706 F.3d at 213. On this score, Plaintiffs again submit that the Act's residence requirement burdens nonresident patients' fundamental right to interstate travel, [Pls.' Opp'n at 37], which encompasses "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," *Saenz v. Roe*, 526 U.S. 489, 500 (1999). They contend that by denying nonresidents access to medical aid in dying, the Act penalizes nonresidents for exercising their fundamental right to travel.[26] [Pls.' Opp'n at 37.]

But "the Supreme Court has applied strict scrutiny only to *durational* residency requirements." *See Connelly*, 706 F.3d at 214 (emphasis added) (collecting cases). Durational-residence-requirement cases, such as *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974), *Dunn v. Blumstein*, 405 U.S. 330 (1972), and *Shapiro v. Thompson*, 394 U.S. 618 (1969), all implicated the "third aspect" of the fundamental right to

---

[25] Nor could they. A law that draws a distinction between state residents and *non*-residents is not automatically suspect. *See Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 390 (1978) (observing that "a differential in cost between residents and nonresidents is not in itself invidious or unconstitutional," and proceeding to employ rational basis review to differential cost imposed by Montana recreational hunting licensing scheme).

[26] They do not claim, because they cannot claim, that the Act's residence requirement burdens a right to access medical aid in dying. As has been discussed herein, there is no fundamental right to medical aid in dying. *Washington v. Glucksberg*, 521 U.S. 702, 728, 735 (1997); *see also Vacco*, 521 U.S. at 799 (observing same in context of challenge under Equal Protection Clause).

travel—"the right to be treated like other citizens of th[e] State" for newly arrived citizens—not the right to be treated like a welcome visitor. *Saenz*, 526 U.S. at 500. And these cases "were analyzed, at least in part, as if the classifications at issue were somewhat suspect, in that they 'penalized a group of people on the basis of their having exercised a constitutionally protected right to travel' " and migrate to another state. *Maldonado v. Houstoun*, 157 F.3d 179, 185, 186 (3d Cir. 1998) (quoting *Lutz v. City of York*, 899 F.2d 255, 265 (3d Cir. 1990)). "The relevant distinction when evaluating a claim asserting a violation of the fundamental right to travel is between long-term and short-term residents, not current residents and prospective residents." *Connelly*, 706 F.3d at 215 (citing *Schumacher*, 965 F.2d at 1267).[27]

New Jersey's medical-aid-in-dying law, by contrast, does not draw a distinction on the basis of a resident's duration in New Jersey, and it does not distinguish between new and old residents. The Act merely imposes a bona fide residence requirement as a condition to receive a prescription for end-of-life medication. Bona fide residence requirements "[generally] do[] not burden or penalize the constitutional right of interstate travel." *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 n.3 (1986)

---

[27] It bears mentioning that the Supreme Court has at times applied heightened scrutiny to durational residence requirements, and at other times applied rational-basis review. *See Schumacher*, 965 F.2d at 1267 (exploring inconsistency, discussing applicable precedents, and attempting to identify a through line). The point remains, however, that "the *Shapiro* lines of cases has, without exception, involved challenges to state laws that create 'distinctions between newcomers and longer term residents.' " *Id.* (quoting *Zobel v. Williams*, 457 U.S. 55, 60–61 (1982)). On the basis of this distinction, the Supreme Court has been willing to strike such laws under some level of scrutiny.

(plurality op.) (first alteration in original) (quoting *Martinez v. Bynum*, 461 U.S. 321, 328–29 (1983)).  For the purposes of a challenge under the Equal Protection Clause, "the right to travel simply is not implicated when there is no discrimination based on the duration of one's residency."  *Connelly*, 706 F.3d at 215.  Nor have Plaintiffs identified any relevant cases claiming otherwise.  *See Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996) (noting as relevant the absence of heightened-scrutiny recognition by Supreme Court).  Therefore, the Court will consider the Act's residence requirement under the rational-basis test.

Under this test, the Act's residence requirement will be upheld only if it is rationally related to a legitimate government objective.  *See Parham v. Hughes*, 441 U.S. 347, 351 (1979); *see also, e.g.*, *Vacco*, 521 U.S. at 799–800.  Laws that neither employ a suspect classification nor impinge a fundamental right are entitled to a "strong presumption of validity."  *Heller v. Doe*, 509 U.S. 312, 319 (1993); *see also Cleburne*, 473 U.S. at 440 ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." (internal citations omitted)).  This means that "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.' "  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Moreover, a "statutory distinction does not violate the Equal Protection Clause 'if any state of facts reasonably may be conceived to justify it,' "  *Sullivan v. Stroop*, 496

51

U.S. 478, 485 (1990) (quoting *Bowen v. Gilliard*, 483 U.S. 587, 601 (1987)), so the Court may consider "any conceivable purpose" and its review is "not limited to considering the goal stated by the state actor," *Connelly*, 706 F.3d at 216 (cleaned up).  Nor does the lack of an explanation by the legislature have any "significance in rational-basis analysis." *Beach Commc'ns*, 508 U.S. at 315.

"Of course, rational[-]basis review is not 'entirely toothless,'" *Schumacher*, 965 F.2d at 1269 (quoting *Murillo v. Bambrick*, 681 F.2d 898, 905 n.15 (3d Cir. 1982)), but given the amount of deference afforded the legislature, it is little surprise that the Supreme Court "hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawai'i*, 585 U.S. 667, 705 (2018).  Courts often resolve whether a challenged law satisfies rational-basis review on a motion to dismiss.  *See, e.g.*, *Children's Health Defense, Inc. v. Rutgers*, 93 F.4th 66, 85, 88 (3d Cir. 2024) (affirming dismissal of equal-protection challenge to Rutgers' vaccination policy at the pleading stage).

Here, the Act's residence requirement is rationally related to legitimate government objectives.  One such objective is to shield from out-of-state liability physicians who prescribe end-of-life medication and other individuals who assist terminally ill patients in dying.  As specified, the Act aims to "guide health care providers and patient advocates who provide support to dying patients."  N.J. STAT. ANN. § 26:16-2(c)(1).  Among other things, it provides them with broad civil and criminal immunity so long as they comply with the terms of the statute.  *Id.* § 26:16-17.  Assisted suicide otherwise remains a crime.  *Id.* § 2C:11-6.  But the State's effort

to protect providers of medical aid in dying and other good-faith actors only extends so far. As has been discussed herein, the permissible practice of medical aid in dying in New Jersey is indistinguishable from the criminal act of assisted suicide in other jurisdictions, *see Kligler*, 198 N.E.3d at 1237 & n.5; *see also Cruzan*, 497 U.S at 280, including Delaware and Pennsylvania, *see* DEL. CODE ANN. tit. 11, § 632(5) (class B felony of manslaughter to "intentionally cause[] another person to commit suicide"); *id.* § 645 (class F felony to "promot[e] suicide" by "intentionally caus[ing] or aid[ing] another person to attempt suicide" or "commit suicide"); 18 PA. CONS. STAT. § 2505(b) (second-degree felony to "intentionally aid[] or solicit[] another to die by suicide" if conduct actually causes suicide or attempted suicide, and second-degree misdemeanor if not).

A conceivable purpose of the Act's residence requirement is to protect from out-of-state liability physicians who prescribe end-of-life medication to terminally ill patients and other individuals who assist such patients in dying. *See Beach Commc'ns*, 508 U.S. at 315 (explaining that "the absence of legislative facts explaining the distinction on the record has no significance in rational-basis analysis" (internal citation omitted) (cleaned up)); *see also Stroop*, 496 U.S. at 485 (court free to consider any conceivable state of facts to justify law); *Connelly*, 706 F.3d at 216 (same). As patients like Govatos and Sealy would conceivably self-administer such medication at home, rather than in New Jersey, [*see, e.g.*, Compl. ¶¶ 30, 35], there is a credible risk that, if the residence requirement did not limit patient eligibility to New Jersey

53

residents, physicians such as Drs. Bryman and Pasik could face reprisals in other jurisdictions that do not share New Jersey's views about compassionate aid in dying.

Having considered Plaintiffs' opposition, the Court is not persuaded that such a risk is speculative. Delaware and Pennsylvania do not limit the territorial scope of their criminal liability to conduct that occurs within each state. If the *result* of the criminal activity occurs in the state—i.e., self-administration of end-of-life medication that a New Jersey physician may prescribe—liability could obtain. *See* DEL. CODE ANN. tit. 11, § 204(a)(1) (a person may be convicted in the state if "either the conduct or the result which is an element of the offense occurs within [the state]"); 18 PA. CONS. STAT. § 102(a)(1) (same).[28] And the specter of criminal liability for assisted suicide is a non-trivial risk. Assisted suicide is punishable by a term of imprisonment. *See* DEL. CODE ANN. tit. 11, § 4205(b) (class B felony, two to twenty-five years); *id.* (class F felony, up to three years); 18 PA. CONS. STAT. § 1103(2) (second-degree felony, up to ten years); *id.* § 106(b)(7) (second-degree misdemeanor, up to two years). Given

---

[28] Under both statutes, an exception applies to paragraph (a)(1) when "causing a particular result is an element of an offense and the result is caused by conduct occurring outside Delaware which would not constitute an offense if the result had occurred in the same place [the other state]." DEL. CODE ANN. tit. 11, § 204(b); *see* 18 PA. CONS. STAT. § 102(b) (same). But the exception is itself subject to an exception, which is relevant here: the exclusion shall not apply if "the defendant intentionally, knowingly or recklessly caused the result within Delaware." DEL. CODE ANN. tit. 11, § 204(b); *see* 18 PA. CONS. STAT. § 102(b) (similar, but limited to intentional or knowing mens rea). Here, a New Jersey physician who prescribes end-of-life medication, or any pharmacist who dispenses it, would necessarily do so with knowledge or intent to cause the terminally ill patient to self-administer such medication in their home state. Therefore, treating nonresidents would carry a risk of criminal prosecution in their home states.

the State's "great latitude" to legislate for the health and safety of its citizens, *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (citation omitted), including as to the practice of medicine, *see Zahl v. Harper*, 282 F.3d 204, 210–11 (3d Cir. 2002) (recognizing that "New Jersey has a heavy and traditional interest in regulating the practice of medicine within its borders"), the Court concludes that the protection of physicians and other providers is a reasonable objective of the Act's residence requirement.[29]

Finally, the residence requirement is rationally related to the protection of physicians and others from out-of-state liability. By requiring a terminally ill patient to demonstrate a residence in New Jersey to receive a prescription for end-of-life medication, *see* N.J. STAT. ANN. § 26:16-6(a)(2), the Act strongly reduces the

---

[29] There appear to be others too. For instance, Defendants also contend that guarding against the undue pressures that may affect terminally ill patients is a legitimate government objective. [Defs.' Br. at 22–23.] The Court can hardly disagree with that. *See Glucksberg*, 521 U.S. at 731–32 (explaining, in the context of medical aid in dying, that "the State has an interest in protecting vulnerable groups—including the poor, the elderly, and disabled persons—from abuse, neglect, and mistakes"); *see also Cruzan*, 497 U.S. at 281 (recognizing the risk of coercion and undue influence in end-of-life situations). The Act specifies that it aims to "assist capable, terminally ill patients who request compassionate medical aid in dying," "protect vulnerable adults from abuse," and "ensure that the process is entirely voluntary on the part of all participants." N.J. STAT. ANN. § 26:16-2(c)(2), (3), (4). It also declares that the legislation is "necessary for the welfare of the State and *its residents*." *Id.* § 26:16-2(d) (emphasis added). But the State's ability to guard against undue pressures affecting terminally ill patients in other jurisdictions is much more limited. The states' police powers to protect health and safety are matters of "local concern," directed towards the general welfare of "their citizens." *Medtronic*, 518 U.S. at 475 (citation omitted). Thus, the State reasonably requires a patient to be a New Jersey resident to receive a prescription for end-of-life medication given its limited capacity to protect nonresidents who seek medical aid in dying.

possibility that New Jersey providers will be prosecuted for assisted suicide in another jurisdiction. That is sufficient. The Court is mindful that the residence requirement need not be the least restrictive means to achieve this end. *See Tolchin*, 111 F.3d at 1114. Rational-basis review tolerates an "imperfect fit between means and ends." *Heller*, 509 U.S. at 321. Therefore, because Plaintiffs have not met their burden "to negative every conceivable basis which might support" the Act's residence requirement, *Beach Commc'ns*, 508 U.S. at 315, their equal protection claim must be dismissed. Accordingly, the Court will also dismiss Count III of the Complaint.

## V. CONCLUSION

At its core, this case presented the question whether the United States Constitution *requires* the State of New Jersey to extend medical aid in dying to nonresidents because it affords the non-fundamental privilege to its own residents. For the reasons articulated above, this Court concludes that the answer is no. The State Legislature determined that access to medical aid in dying should be limited to residents of the State, and that decision is rationally related to the legitimate objective of protecting providers and advocates who assist terminally ill patients in seeking medical aid in dying.

This Court "may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). Because medical aid in dying "is not basic to the maintenance or well-being of the Union," *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 388 (1978); *see also McBurney v. Young*, 569 U.S. 221, 234 (2013), and the Act's residence

56

requirement is otherwise reasonable, the Court concludes that the Constitution does not require New Jersey to extend access to medical aid in dying to nonresidents.

Therefore, the Court will **GRANT** Defendants' Motion to Dismiss.    An accompanying Order shall issue separately.

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

DATED:  **September 18, 2024**